AMBOOK ENTERPRISES, Plaintiff,

v.

TIME INCORPORATED et al., Defendants.

No. 72 Civ. 5438.

United States District Court, S. D. New York.

Jan. 11, 1979.

As Amended March 13, 1979.

Lyman & Ash by Cletus P. Lyman, Philadelphia, Pa., for plaintiff.

Cahill, Gordon & Reindel by Floyd Abrams, P. Kevin Castel, New York City, for defendant The New York Times Co.

Cravath, Swaine & Moore by Frederick A. O. Schwarz, Jr., Richard M. Hirsch, Ronald P. Mysliwiec, New York City, for defendant Time Inc.

Paul, Weiss, Rifkind, Wharton & Garrison by Martin Kleinbard, Cameron Clark, Jack A. Horn, New York City, for defendant Young & Rubicam, Inc.

Breed, Abbott & Morgan by David S. Patterson, Donald B. da Parma, New York City, for defendant J. Walter Thompson Co.

Lunney & Crocco by J. Robert Lunney, Michael J. McAllister, New York City, for defendant Batten, Barton, Durstine & Osborn, Inc.

Donovan, Leisure, Newton & Irvine by Thomas R. Trowbridge III, John K. Hendricks, New York City, for defendant American Association of Advertising Agencies, Inc.

## OPINION

GRIESA, District Judge.

This is an antitrust action brought in June 1972 by a company which formerly operated a book club. The suit was brought against The New York Times Company; Time Incorporated; four leading advertising agencies—Batten, Barton, Durstine & Osborn, Inc. ("BBDO"); J. Walter Thompson Company; Young & Rubicam, Inc.; and Ted Bates & Co., Inc.—and the American Association of Advertising Agencies, Inc. ("4A's").

Plaintiff asserts a claim under Section 1 of the Sherman Act, 15 U.S.C. § 1. The action was originally brought as a class action. Class certification was denied, 60 F.R.D. 476, leaving Ambook as the sole plaintiff. One of the defendants, Ted Bates & Co., Inc., has settled.

The remaining defendants have moved for summary judgment dismissing the action. These motions are granted.

I.

The operative pleading of Ambook is the second amended complaint (hereafter "the

complaint").[1] The complaint alleges that defendants have combined and conspired with one another and with other publishers and advertising agencies, including almost all the periodical and newspaper publishers and advertising agencies in the United States. It is alleged that the purpose and effect of the combination and conspiracy was to coerce advertisers, including Ambook, to purchase the services of advertising agencies; to prevent advertisers, including Ambook, from establishing alternative "in-house" organizations capable of furnishing the services offered by advertising agencies; and to fix a uniform price for the services provided by advertising agencies equal to approximately 17.6% of the price of advertising charged by publishers. The complaint alleges that, in furtherance of the combination and conspiracy, publishers have established a "dual rate structure," under which advertising space is made available to advertising agencies at a discount of 15%,[2] which discount is not available to advertisers dealing directly with publishers. The complaint alleges that advertising agencies, acting in concert, sell advertising space to advertisers at the "rate card" rates of the publishers, thus retaining the 15% discount allowed by the publishers. It is alleged that, as a result of the foregoing, conspirator advertising agencies (including the agency defendants) have been compensated to an unfair and excessive extent for their services. The complaint alleges that Ambook has been forced to pay in excess of $9,000 to advertising agencies for their services in connection with advertising in The New York Times and Time magazine, which expenditures are excessive to the extent of at least $4,000; and that Ambook has been forced to pay in excess of $50,000 to advertising agencies in connection with advertising in "conspirator publications," which expenditures are excessive to the extent of at least $20,000.

It is of some interest to note that the allegations in the second amended complaint, while they do not assert class action claims (class certification having been denied), are in many respects a carry-over from the original class action concept, in which Ambook itself was a rather minor factor. The choice of defendants was obviously made with a view to the alleged class claims. Thus the four advertising agency defendants were selected because they are leading agencies, not because Ambook dealt with any of them. Ambook placed advertising through three agencies connected with one Victor Schiff. The names of these agencies were Newmark, Posner & Mitchell, Inc.; Victor Schiff & Co.; and Schiff/Brown & Co. Neither Schiff nor any of his agencies is a defendant in this action. It is also clear that Ambook selected the publisher defendants mainly with a view to the class claim. Time Incorporated is, of course, a leading magazine publisher, and The New York Times Company is a leading newspaper publisher. It is true that Ambook placed some advertising in The New York Times and Time. However, Ambook placed advertising in at least 43 other publications, none of which is named as a defendant. It appears that Ambook spent about $39,000 on advertisements in The New York Times and about $40,000 on advertisements in Time. The total amount paid by Ambook for media advertising, according to Ambook, was about $388,000.

## II.

In June 1976 defendants filed motions for summary judgment. These motions were denied July 6, 1977. Although the parties had submitted considerable evidence on the question of whether the defendant advertising agencies and the defendant publishers had or had not engaged in conspiratorial

---

1. The court granted a motion to strike paragraph 19 of the second amended complaint, which alleged violation by defendants of a 1956 consent decree in a Government antitrust action against the 4A's.

2. The relation between the 17.6% and the 15% is as follows. If $1,000 worth of advertising is purchased from a publisher and a 15% discount is allowed to an agency, the agency is charged $850. If the agency's client pays the agency the full $1,000, then the agency compensation is $150, which is 17.65% of the $850.

conduct, little evidence or argument was presented about the relationship between Ambook and the advertising agencies with which Ambook actually dealt. There was little evidence with regard to the question of whether Ambook was "coerced" into dealing with the Schiff agencies, or whether the compensation received by the Schiff agencies was fixed by a combination or conspiracy.

After further discussion of the issues, Ambook designated the witnesses it would call upon the trial of the action: (a) Victor Schiff and Stephen Brown, the principals of the three advertising agencies used by Ambook; (b) Elia K. Georgiades, a former employee of Ambook; and (c) Milton Pierce, a person in the advertising business, who introduced Ambook to Schiff.

The depositions of these four persons were taken—Schiff on December 9, 1977, Pierce on February 9, 1978, Georgiades on February 13, 1978, and Brown on March 15, 1978. The testimony in these depositions is accepted as true by plaintiff, except as specifically noted in a letter of plaintiff's attorney dated March 24, 1978.[3]

In addition to designating its witnesses, Ambook has made a definitive designation of all documents it would offer into evidence at a trial.

Following the completion of the depositions of Ambook's witnesses, defendants (except for Ted Bates, which has settled) filed new motions for summary judgment.

It should be noted that the principal of Ambook was Cletus P. Lyman, who is also Ambook's attorney in this action. His deposition was taken by defendants in 1976, and has been referred to extensively in the summary judgment motions. Lyman has submitted an affidavit dated June 5, 1978 in opposition to the second set of summary judgment motions. Lyman stated at a hearing January 25, 1978 that he did not expect to be a witness at the trial. However, it now appears that Lyman would

testify at a trial. In a letter dated October 31, 1978 Lyman announced the name of another attorney who would try the case for plaintiff.

### III.

In order for Ambook to recover, Ambook must show the existence of a conspiracy within the four-year period (1968–72) preceding the commencement of this action. 15 U.S.C. § 15b. Ambook must also show that it was injured in its business or property by reason of the conspiracy. 15 U.S.C. § 15.

In connection with the first summary judgment motion, Ambook listed 130 specific factual contentions, which Ambook argued demonstrated at least a triable issue of fact as to the existence of a conspiracy during the damage period.

In a memorandum filed January 6, 1978 Ambook filed a number of supplemental factual contentions, numbered 131–154. Ambook's memorandum of June 6, 1978, opposing the second set of summary judgment motions, amended to some extent contentions 131–154 and added contentions 155–166.

Ambook contends that during the "damage period" 1968–72 there was a "system," which was accepted and used on a virtually uniform basis by newspaper and magazine publishers, and by advertising agencies. This system is alleged to have had the following interdependent features, which had the result, according to Ambook, of unlawfully requiring Ambook to incur excessive costs in the placement of advertising. Ambook contends that the basic features of the system are:

(1) Newspaper and magazine publishers grant a 15% commission to advertising agencies, which is not granted to advertisers dealing directly with the publishers.

---

**3.** The letter of March 24, 1978 also indicates that Ambook might call an economist to testify as to certain matters at the trial. No affidavit of any such economist has been submitted on the summary judgment motion. The subjects of possible economic testimony do not bear on the summary judgment motion.

(2) The advertising agencies charge their clients the full newspaper or magazine list price for the advertising, thus retaining the 15% commission as agency compensation.

Ambook contends that this system was the result of a conspiracy in violation of Section 1 of the Sherman Act. Ambook argues that, as a result of the unlawful conspiratorial system, Ambook was unable to purchase advertising directly from publishers at rates equal to the rates charged to advertising agencies, and that therefore Ambook was economically "coerced" into dealing with advertising agencies. Ambook contends that, pursuant to the illegal system, the agencies it dealt with received the 15% commission from the publishers, and then charged Ambook the full price of the advertising, thus retaining the 15% commission as agency compensation.

As already described, Ambook is not suing the agencies it dealt with. However, Ambook contends that these agencies were co-conspirators and that Ambook can recover against *other* co-conspirators—*i. e.,* the defendants. Ambook also contends that, even if the agencies it dealt with were not co-conspirators, Ambook can show damages causally related to the conspiracy participated in by defendants.

Ambook contends that the conspiracy was commenced by the 4A's in 1917. As Ambook stated in its memorandum in opposition to the original summary judgment motions (p. 59):

"It is clear that the 4A's initiated the 15% commission system in the period 1917 through 1923 . . . and continued to maintain it beyond the injury period [1968–72]."

The principal instances of overt conspiratorial activity relied on by Ambook occurred in the 1920's and 1930's. Ambook cites little in the way of alleged overt conspiratorial activity occurring in the years 1968–72,

but argues that the "15% commission system" was in effect during those years, that it was the result of the conspiratorial activities of early years, and that adherence to the system by publishers and advertising agencies amounted to "consciously parallel practices."

Defendants, on the other hand, argue that Ambook has no evidence even raising an issue of fact as to the existence of a conspiracy during 1968–72. Defendants argue that evidence of alleged conspiratorial activity in the 1920's and 1930's can form no basis for an inference of a conspiracy 40 or 50 years later. Defendants argue that there is another circumstance, other than mere age, that renders Ambook's evidence of no weight in the present case—that is, a Government antitrust action brought in 1955 against the alleged leader of the conspiracy—the 4A's—and other trade associations, resulting in consent decrees in 1956.[4] Defendants contend that Ambook has no evidence of any conspiratorial agreements during the period after 1956, and that, to the extent that publishers engaged in parallel conduct in granting a 15% agency commission and agencies engaged in parallel conduct in keeping the commission as their compensation, these parallel practices were non-conspiratorial and entirely legal.

Defendants contend that Ambook employed the Schiff agencies solely because Ambook needed and desired the services of an advertising agency, and not because such employment was "coerced" by any agency-publisher conspiracy. Finally, defendants contend that the compensation arrangements between Ambook and the Schiff agencies were not in any way fixed by any conspiracy.

## IV.

The facts set forth in this opinion are drawn from Ambook's own evidence, and

---

**4.** As earlier described in footnote 1, paragraph 19 of the second amended complaint, alleging violation of the 1956 consent decree involving the 4A's was stricken. This ruling was based on decisions such as *Data Processing Financial & General Corp. v. IBM*, 430 F.2d 1277 (8th Cir. 1970), holding that third parties cannot enforce, or assert violations of, consent decrees. This does not mean that the 1956 consent decrees cannot be referred to in the present case as an important part of the factual background, which they clearly are.

from uncontradicted evidence submitted by defendants.

The 4A's was founded in 1917. Ambook contends that commencing at this time the 4A's organized the alleged conspiracy.

J. Walter Thompson and a predecessor firm of BBDO were apparently members of the 4A's from the start. Young and Rubicam was founded in 1923 and became a member of the 4A's in 1931. Ambook asserts that The New York Times was a member of the American Newspaper Publishers Association and the Publishers Association of New York City.

For several decades prior to 1917 there was a common practice among newspaper (and probably magazine) publishers to grant advertising agencies a substantial percentage discount or commission deducted from the standard "rate card" rates which would be charged to advertisers dealing directly. The New York Times granted such a commission to advertising agencies well before 1917. Also, there was a common practice among advertising agencies to retain these commissions as compensation for services to their clients. There were exceptions to these common practices. Under certain circumstances advertisers or "house agencies" were able to obtain the agency commissions from publishers. Agencies would sometimes "rebate" at least part of the commissions to their clients. The amounts of the commissions granted by the publishers varied.

As evidence of the conspiracy allegedly starting in 1917, Ambook relies upon a variety of documents, prominent among which are excerpts from minutes of the 3d, 4th, 5th and 6th annual meetings of the 4A's in the years 1919, 1920, 1921, and 1922 respectively.

In 1919 the president of the 4A's was William H. Jones, who was president of George Batten Company, a predecessor of BBDO. Stanley Resor of J. Walter Thompson was chairman of a 4A's committee called the Agency Service Committee in 1922. However, these are the only persons referred to in the evidence about the alleged formative years of the conspiracy, which can be identified with any of the agency defendants. Moreover, the real organizers of what Ambook alleges to be conspiratorial activity are not shown to be connected with any of the agency defendants. These persons are Collin Armstrong, Chairman of the National Newspaper Committee of the 4A's in the 1920's; James O'Shaughnessy, Executive Secretary of the 4A's in the early 1920's; and A. W. Erickson, President of the 4A's in 1922, and chairman of various committees in the 1920's.

The 4A's minutes indicate that Erickson was the spearhead of a movement to persuade newspaper publishers to standardize the amount of their commissions to agencies at 15% regular commission plus an extra 2% cash discount. Erickson reported to the 1920 meeting that he had evolved what he termed the "15/2 idea" in early 1918, had submitted the proposition to the Executive Board of the 4A's, with the result that he was appointed chairman of a committee to take steps to achieve the standardization. Erickson pointed out that at the time his campaign began, there were varying terms offered by various publishers, averaging about 13% regular commission plus 3% cash discount. By 1922 Erickson's committee had obtained a "referendum" from the agencies which were members of the 4A's, with a 100% vote for the 15/2 system. Also, Erickson's committee worked in various ways to obtain the agreement of newspaper publishers to the standard 15/2 commission. He reported in 1922 that he was 99% successful in the daily newspaper field, and that his committee was working steadily with the few large newspapers, such as The New York Times, which had not agreed to the 15/2. The Times was granting a 10% commission plus 5% cash discount, and was refusing to change.

According to the documents proffered by Ambook, Armstrong and his committee were active in attempting to persuade publishers, both directly and through trade associations, to discontinue the granting of agency commissions to either advertisers dealing directly or "house agencies" controlled by advertisers. Armstrong and his

committee were also seeking to persuade publishers to refuse to deal with any agencies known as "rate cutters"—those who "rebated" all or part of their commissions to their clients. Complaints were made to publishers about individual instances where commissions were given to advertisers or house agencies, or where commissions were given to agencies known to make rebates to their clients. A letter from Armstrong's committee dated February 11, 1920 indicates that certain newspapers, including The New York Times, had agreed to discontinue allowing net rates to advertisers dealing directly. Certain correspondence in December 1920 indicates that The New York Times had agreed with Armstrong to discontinue dealing with an agency which was rebating part of its commission.

The minutes of the four meetings of the 4A's held in 1919, 1920, 1921 and 1922 contain occasional references which indicate coercive conduct on the part of the 4A's—i. e., discussions about policing rate cutters; cleaning up unsatisfactory conditions; disciplining publishers who are "not honest;" bringing publications "into line."

According to the documents, trade associations of publishers—including the American Newspaper Publishers Association ("ANPA")—developed lists of advertising agencies which they recognized. The objective of Armstrong and his committee was to have the publishers' associations adopt standards for recognition, which were basically the same as the standards which the 4A's ruled to be proper practice on the part of agencies.

The minutes of the 4A's annual meeting in 1922 reflect that Armstrong had endeavored to impress a number of publishers' associations throughout the country with the detrimental effects of "cut-rate agencies," and several of the associations, including the ANPA and the New England Publishers' Association, passed resolutions condemning rebating.

According to the various minutes, there were efforts starting in the 1920's to persuade advertising agencies and newspaper publishers to use a standard form of contract, in which the agency would agree not to rebate any of the agency commission to its client. The early efforts in this regard were not successful. However, a standard form, containing a no-rebate clause, was adopted by the 4A's in 1933.

In 1937, a brochure was prepared by the Committee on Fiscal Control of the 4A's. The members of this committee included persons from J. Walter Thompson, BBDO, and Young & Rubicam. This brochure contained suggested provisions for contracts between agencies and clients, and contained a note stating that agency compensation "is founded on the principle that the agency retain all commissions" received from the media. The brochure also stated that the system of having the agency retain the media commission as its compensation "should in no case be replaced by any other agency compensation system, but may be supplemented."

Another 4A's document from the year 1937 is entitled "Agency Recognition." This document states that the recognition of agencies is the function of media owners and their associations. The document states that it is generally held "by recognizing authorities" that the following are the basic requirements for recognition as an advertising agency—that it must be a bona fide agency free from control by an advertiser, and that it must retain all commissions received from media owners. The document lists among the "recognizing authorities" the ANPA and the Publishers Association of New York City.

A document said by Ambook to stem from "the 1950's" lists the qualifications established by the Publishers Association of New York City for recognition as an advertising agency—i. e., that the agency must be a bona fide agency functioning as an independent contractor, and that it must refrain from "destructive practices" such as splitting commissions.

As described earlier, The New York Times, as of the early 1920's, gave an agency commission of 10% with an additional 5% discount for cash payment, and resisted efforts of the 4A's to adopt the desired stan-

dard 15/2. At some point the Times did decide to grant the 15/2 commission and discount. The only purported evidence about this decision is the text of a speech made in 1950 by Frederic R. Gamble, then president of the 4A's, who stated that through the educational work of the 4A's and through competitive conditions The New York Times and certain other papers went to the 15% commission in the early 1930's.

Time magazine was first published in 1923. Ambook has suggested no evidence whatever as to when Time first granted the 15% commission or the circumstances surrounding Time's decision to do so.

Ambook has provided what it says is a summary of certain documents in the files of the Federal Trade Commission. According to this summary, in the early 1920's the staff of the FTC undertook an investigation of the "15% commission system." The investigation was concluded in 1924. The Commission then instituted a proceeding for an order enjoining anticompetitive practices. A hearing was held in 1926, at which evidence was taken. The proceeding was dismissed in 1930 without opinion. According to Ambook's summary, certain FTC minutes reveal that the basis for the dismissal was the lack of effect upon interstate commerce. Ambook asserts that this ruling was evidently made upon the basis of *Blumenstock Bros. v. Curtis Publishing Co.,* 252 U.S. 436, 40 S.Ct. 385, 64 L.Ed. 649 (1920), which was later overruled by *Lorain Journal Co. v. United States,* 342 U.S. 143, 72 S.Ct. 181, 96 L.Ed. 162 (1951), in which it was held that national advertising involved interstate commerce for purposes of the antitrust laws.

In 1955 the Department of Justice instituted a civil antitrust action against the 4A's, the ANPA, the Publishers Association of New York City, and other trade associations. The complaint alleged that, beginning in or about 1917, these trade associations carried on a conspiracy in violation of Section 1 of the Sherman Act. It was alleged, among other things, that these trade associations adopted standards, and used other devices, resulting in a system whereby only the advertising agencies recognized by these associations would be extended commissions by publishers, and advertisers and house agencies would not be extended such commissions. It was further alleged that the agency commissions were fixed and maintained at 15% of the publishers' gross rate for advertising, and that the agencies were required to agree to retain and not rebate any part of the agency commissions to their clients. The complaint alleged that the advertising agencies and the publishers who were members of these trade associations were members of the conspiracy, although the members of the associations were not joined as defendants in the action.

In 1956 consent judgments were entered enjoining the defendants, including the 4A's, from the practices complained of. Thus the trade associations were enjoined from engaging in any practice which prevented media from granting commissions to advertisers dealing directly or to house agencies. The associations were enjoined from taking any steps to fix the amount of commissions allowed by media to agencies, or to fix the amount of compensation received by advertising agencies from their clients. This meant that the associations could take no steps to prevent advertising agencies from rebating all or part of the media commissions to their clients.

Ambook has designated various items of evidence relating to the period after 1956. These include speeches by Frederic Gamble and John Crichton, presidents of the 4A's. The Gamble speech was in 1959 and the three Crichton speeches were in 1967, 1968 and 1972. There is also a letter of Crichton written in 1968. The materials include speeches in 1968, 1972 and 1973 by Harry Paster, a person associated with the 4A's, who studied the trends in agency compensation, and a study of Time Incorporated entitled "Time and the 15% Commission" dated July 1970. Ambook also relies upon a 4A's pamphlet issued in 1971.

Following the 1956 consent judgments, the Association of National Advertisers ap-

pointed Albert W. Frey, Professor of Marketing at the Amos Tuck School of Business Administration of Dartmouth, to undertake a study of agency compensation. Professor Frey's report was issued in February 1958. The report stated, in part, that the rebating of media commissions by agencies to clients "is far from being an unknown practice now," and that there is no reason why an agency should refrain from such rebating. The Frey report recommended against any standardized compensation system, and urged that compensation be set according to the individual circumstances.

The post-1956 documents proffered by Ambook expressly refer to a variety of compensation methods which were in use between advertisers and advertising agencies. The Paster materials list eight types of compensation arrangements as follows:

1. Media commissions plus percentage of other charges and additional fees for certain specified services.
2. Same as No. 1, without the additional fees for certain specified services.
3. Media commissions only.
4. One of Nos. 1, 2, or 3, plus an overall fee, sometimes called a retainer.
5. One of Nos. 1, 2, or 3, but with the addition of a guaranteed minimum profit percentage and a controlled maximum profit percentage.
6. Minimum fee or media commissions, whichever is larger.
7. Overall fee on the entire account, with no other compensation, the fee to be agreed upon in advance and billed periodically.
8. Cost plus an agreed overage.

No. 3 is the only method relating solely to media commissions. Nos. 1, 2, and 4 are what are referred to as "commissions plus." No. 5 offers the possibility of an overage above commissions to achieve an agreed minimum profit, but also involves the possibility of the compensation being cut below total commissions to remain within an agreed maximum profit. No. 6 is a departure from the pure media compensation ba-

sis, in that there is an agreed-upon minimum to be paid even if commissions do not reach that figure. Nos. 7 and 8 are obviously complete departures from the media commission method of compensation.

The post-1956 materials indicate that media commissions and "commissions plus" were the predominate forms of compensation between advertising agencies and their clients. However, the materials, including the Crichton and Paster speeches and the Crichton letter, show that the other methods—particularly the use of overall fees and cost-plus arrangements—were steadily growing. The Crichton speech of 1967 stated that overall fees and cost-plus arrangements were 3.1% of total billings in 1967, up from .4% in 1957. The Paster speech of 1972 stated that overall fees and cost-plus arrangements were 5% of total billings. The Crichton speech of 1972 stated that the overall fee arrangements amounted to 6% for the agencies doing $10–$40 million business.

The affidavits submitted by defendants present a wealth of uncontradicted facts about differing compensation arrangements between advertising agencies and their clients after 1956.

An affidavit from BBDO states that this agency utilizes several methods of compensation—including both media commissions and overall fees—and has done so since at least January 1965. The method of compensation is subject to negotiation with the client. Of particular interest is the fact that BBDO provided direct response advertising service to Book of the Month Club during 1968–70.[5] Book of the Month Club compensated BBDO on an overall fee basis.

An affidavit from Young & Rubicam states that for many years that agency has used a number of different compensation arrangements, and that the prevalence of the straight media commission method has been on the wane for at least 15 years. Commencing in the late 1960's Young & Rubicam has used compensation arrange-

---

**5.** As described hereafter in this opinion, the type of advertising which a book club such as

Ambook generally uses is direct response advertising.

ments other than the straight media commission method with most of its new accounts.

The deposition of Daniel Seymour, former president of J. Walter Thompson, states that during the years 1964–74 that agency's agreements with its clients were "all over the lot," rather than being based solely on the media commission.

An affidavit of Daniel F. Sullivan, Jr., Credit Manager of Time Incorporated, refers to public announcements in the 1960's and early 1970's by 23 advertising agencies regarding the use, either generally or with specific clients, of compensation arrangements other than the media commission method.

Ogilvy, Benson & Mather, Inc. was a leader in the movement away from the media commission method. In 1960 David Ogilvy addressed the Association of National Advertisers, and announced that his agency had been appointed to represent Shell Oil Company, and that it had been agreed that compensation would be on the basis of an overall fee rather than the 15% media commission. Ogilvy argued in his address that the fee method of compensation was superior to the method based on media commissions, and that his firm was ready to change to a fee basis with any of its clients. John Elliott, Jr., a senior vice president of the Ogilvy agency, gave a speech in 1963 to a meeting of the 4A's in which he argued that overall fees were superior to media commissions as a basis for agency compensation. In 1966 Ogilvy & Mather International Inc. issued a prospectus regarding an offer of common stock to the public, which stated that in 1965 38% of that firm's income from clients consisted of fees under fixed fee contracts.

In 1964 the National Industrial Conference Board published the results of a "Survey of Business Opinion and Experience on Ad Agency Compensation and Services." The report stated that 40 of the 181 companies responding to the survey compensated their advertising agencies on the basis of some variation of, or alternative to, the straight 15% commission.

In 1967 the Association of National Advertisers published a report entitled "A.N.A. Member Practices and Views on Advertising Agency Compensation," stating that 88 of the 380 companies responding to a survey compensated advertising agencies on the basis of a fee or other arrangement as opposed to the media commission. A similar report of the A.N.A. published in 1972 stated that 53 out of 181 companies used a fee arrangement instead of media commission.

Neither the documents nor any other evidence proposed by Ambook suggest that, following the consent decrees of 1956, there was any step taken by the 4A's or anyone else to prevent advertising agencies from making whatever compensation arrangements they wished with their clients. The use of fees and cost-plus arrangements was growing, and there is no evidence that the 4A's or anyone else was engaging in any kind of conspiratorial activity to put a stop to the growth of these different compensation methods.

Ambook has specifically conceded that it has no evidence of conspiratorial activity by the 4A's during the period 1968–72, or at any time after 1960. There is no evidence that the 4A's did anything during the damage period, or for many years prior to the damage period, to promote or maintain any phase of the alleged conspiracy. This finding is crucial to the present case, since it means that the alleged promoter and leader of the conspiracy was not performing these functions during the period relevant to this lawsuit.

V.

The record also contains various uncontradicted facts about the practices of newspaper and magazine publishers following the 1956 consent decrees.

The Government antitrust action did not seek to prohibit publishers from granting commissions to advertising agencies, nor did it seek to change the amount of such commissions from the 15% which had become standard. Nothing in the 1956 consent de-

crees required publishers to drop the commissions or change the percentage.

It appears that after 1956 and at least through the years 1968–72, there continued to be a general practice among newspaper and magazine publishers of granting a 15% commission to advertising agencies. Such a commission was granted by The New York Times and Time.[6] It is safe to assume that each of the 45 publications in which Ambook advertised granted the 15% commission.

However, after the 1956 consent decrees certain essential changes respecting publishers occurred.

It will be recalled that, according to the documents presented by Ambook, there were attempts by the 4A's during the 1920's and 1930's to persuade publishers to boycott advertising agencies which rebated the commission to their clients. In 1933 the 4A's promulgated a form of contract for use by publishers and agencies, which contained a clause in which the agency agreed not to rebate any part of the commission.

In 1956 the 4A's promulgated a revised contract form, eliminating the no-rebate clause. There is no evidence that, after 1956, the 4A's did anything to induce publishers to boycott advertising agencies which rebated all or part of the 15% commission. There is no evidence that the two publisher defendants in this action—The New York Times and Time—took any steps after 1956 to prevent advertising agencies from rebating the 15% commission to their clients.[7] Indeed, it is clear that both The New York Times and Time dealt with advertising agencies which in effect "rebated" all or part of the 15% commission. There is no evidence that either The New York Times or Time objected to this or took any action to stop it.

It is alleged that one feature of the conspiracy in this case was that it prevented advertisers from developing "alternative in-house organizations" capable of furnishing advertising services. Indeed, the documents presented by Ambook contain numerous references to efforts by the 4A's, at least in the 1920's, to prevent publishers from granting the 15% commission to house agencies.

The uncontradicted evidence is that, during the years 1968–72 and prior thereto, both The New York Times and Time granted the 15% commission to house agencies.

Prior to 1970 The New York Times had a policy of requiring an agency to represent at least three clients before it could qualify for the agency commission. In practice, during the 1960's, the Times began granting the commission to house agencies—i. e., agencies representing only one client. The three-client requirement was officially dropped in 1970.

It should be noted that there is deposition testimony of a New York Times employee that persons at the Times discussed the three-client requirement with persons at The Wall Street Journal. However, there is no showing that these conversations had any significance. There is no evidence that they involved any agreement or conspiracy. Ambook does not propose to offer any additional evidence about this matter at the trial.

Prior to 1964 it was the policy of Time to grant the 15% agency commission only to independent agencies. However, this policy was revised in 1964. Thereafter Time granted the agency commission to any agency, including house agencies, so long as the agencies were capable of preparing advertisements.

In 1970 Henry Luce, III, then publisher of Time, asked a committee of Time employees to examine and report on the following proposition:

**6.** At The New York Times, the 15% commission did not apply to advertisements covered by its Retail Store Advertising Rate Card.

**7.** Ambook suggests there is evidence that The New York Times used the 1933 4A's form contract with the Schiff agencies on the Ambook advertising. There is no substance to this contention, for reasons which will be discussed hereafter.

"TIME wants to eliminate the agency commission. What are the alternatives to this method of compensation? How can these alternatives be implemented?"

The committee made a study of the subject, which included interviews with advertisers, advertising agencies, and competitors.[8] The agencies interviewed included Young & Rubicam and BBDO. The committee prepared a report, completed in July 1970, entitled "Time and the 15% Commission." The report noted that there were several options open to Time. One was total elimination of the 15% commission. Other options included increasing or decreasing the commission.

The committee recommended that, for the time being, Time should continue granting the 15% commission to agencies. Elimination or reduction of the commission involved a risk that advertising agencies would channel business away from Time. An increase in the agency commission would cost Time more money in commissions, without foreseeable benefits.

However, the report noted that the 15% commission system was under "heavy stress" because of the development of new forms of compensation arrangements between advertisers and agencies, and because of other factors altering the traditional relationships between advertisers and agencies. The report foresaw the distinct possibility that demand from advertisers would at some future time make it appropriate for Time to discontinue giving the 15% commission to agencies. However, the report concluded that, as of the time of the study, such a demand did not yet exist.

While the Time management was still considering the matter, Edward L. Bond, Jr., Chairman of Young & Rubicam, wrote Bernhard M. Auer, Executive Vice President of Time, a letter dated September 24, 1970, expressing concern about the possibility of Time discontinuing the agency commission.

On October 2, 1970 Auer addressed a memorandum to Henry Luce, Andrew Heiskell and others in the top management of Time. The memorandum stated that Auer had talked to Bond and had explained to Bond why Time felt it must "accept business from a company direct on a net basis." Auer told Bond that he "totally rejected the concept that the agencies were working for us and media departments were doing our selling for us." The memorandum stated that Bond "was understanding and had no solution, but wanted to express his feelings that this could deteriorate into a very serious problem for him and other agencies." Auer told Bond that Time would not make a public statement, and hoped that Young & Rubicam would not start a controversy in the trade press. The memorandum noted that Dan Seymour of J. Walter Thompson had called Andrew Heiskell at Time asking if Time was going to announce a policy that it would accept business direct on a net basis. Heiskell said that Time had no intention of making such an announcement. The memorandum concluded:

"One last thought—let's all remember our policy, which is to remain low key on this subject. We certainly should discuss it on a one-to-one basis with such people as Bond and Seymour, but we don't want to get into the press or meet with any committees."

On November 2, 1970 Henry Luce addressed the following memorandum to Auer:

"Regarding your October 2 memo about agency commissions, and, as I think we've discussed, I believe we should not tell people we would accept business on a net basis: we should tell them that we bill gross to the agency of record, and that the agency of record is whoever the client says it is.

"It is a fine distinction, but I think one that will assist agencies in maintaining the principle of what they obviously depend upon."

---

8. The competitors interviewed were certain magazine publishers. The New York Times was not interviewed. Ambook does not contend—and there is no evidence which would support a contention—that Time's interviews in 1970 of other magazine publishers amounted to a horizontal conspiracy or were otherwise illegal.

On December 4, 1970 Daniel F. Sullivan, Jr., Credit Manager of Time, stated in a memorandum to Henry Luce:

"As of now we allow 15% to any organization that alleges that it's an agency and that's willing to complete our agency questionnaire. This group includes a number of media-buying services and a substantial number of house agencies. There is no standard pattern for the house agency. It may be an independent company with only one account, or it may be a subsidiary of its principal client. There is even one case where it's a division."

Finally, Time issued a public statement, which was quoted in the February 1, 1971 issue of Advertising Age.

"It is our present policy to bill the agency of record, assuming that all credit requirements are satisfactory. The agency is whoever the client says it is."

The evidence about these 1970–71 events at Time is contained solely in documents. Ambook has indicated no intention to introduce further evidence on the subject at a trial.

Before discussing further the question of whether there is a triable issue of fact about the existence of a conspiracy during 1968–72, it is appropriate to set forth the facts about Ambook and its advertising agencies.

### VI.

Ambook operated its book club from January 1968 until June 1972. According to Ambook's advertisements, a person could become a member of Ambook for $5.00, and for this he could order any book of any United States publisher at discounts of between 20% and 70%, or even up to 81%. Each member was to receive Ambook's Master Catalog of Books in Print, listing 30,000 current titles of over 100 American publishers.

The idea for the Ambook venture was conceived by Cletus Lyman some time in 1967. Lyman was a principal in the enterprise throughout its existence. Ambook was organized as a Pennsylvania partnership. The partners were two Delaware corporations—the "managing partner" being American Book Club, the other partner being L Club Corp., which invested capital. Ambook ceased operations in mid-1972, for reasons not related to the claims in this action. Both corporations were formally terminated by the Delaware Secretary of State in 1976.

Sometime in 1967, while Ambook was little more than an idea, Lyman consulted with Milton Pierce, an account executive in an advertising agency named Wunderman, Ricotta & Kline. This firm specialized in direct response advertising or mail order advertising—i. e., advertising involving the use of coupons or order blanks to be mailed in by the consumer. This is the type of advertising used by a book club. Lyman wanted Pierce to do the advertising for Ambook and help him go into business.

The Wunderman firm handled the advertising for another book club, and could not take on Ambook. Pierce recommended that Lyman see Victor Schiff, who specialized in direct response advertising.

At this time Schiff was associated with Newmark, Posner & Mitchell in an office sharing arrangement. Sometime in 1968, Schiff formed Victor Schiff & Co. which became associated with The Kaplan Agency in an office sharing arrangement. Stephen Brown, another direct response advertising specialist, joined Schiff in 1968. In early 1970, Schiff and Brown terminated their relationship with Kaplan and formed Schiff/Brown & Co., Inc.

To return to 1967, Lyman followed Pierce's suggestion and got in touch with Schiff. Schiff agreed to do advertising for Lyman's book club, and Lyman agreed to retain Schiff.

Schiff assumes that, in his discussions with Lyman, he followed his general practice of advising clients that the agency would receive a 15% commission on any advertisements placed in publications and would retain this commission as the agency compensation. Lyman made no objection to this. Lyman never attempted to negoti-

ate a different fee arrangement. Lyman never asked Schiff to pass on all or part of the 15% commission allowed by publishers.

Schiff regarded the 15% commission arrangement as standard procedure. At least as of the time of his dealings with Ambook, he does not believe that he would have approved any other compensation arrangement. Schiff testified that he does not believe that he would have passed on any of the 15% commission allowed by publishers, if he had been requested to do so. Schiff explained:

"Q. Why would you not have considered that?

A. I feel that I had to make a general decision as to the worth of the services and expertise that was provided, and the yardstick I used, which became the basis for the decision, was the 15 percent commission arrangement."

Brown was not a party to whatever discussions occurred between Schiff and Lyman about compensation. However, he testified that the compensation arrangement was standard in the industry. He testified that the 15% commission was simply "in the air." It was referred to in publications such as Advertising Age, and was "what everybody understood to be the traditional fee system."

However, the uncontradicted testimony of both Schiff and Brown is that the Schiff agencies were free to make whatever fee arrangements they wished with Ambook, and that there was nothing to prevent the Schiff agencies from passing on any part of the 15% agency commission, received from publishers, if they had desired to do so.

Schiff recalls no written or oral communication from the 4A's regarding agency compensation. Although the Newmark and Kaplan agencies were members of the 4A's, Schiff's own agencies were not. There is no evidence of any communications by the Schiff agencies with any agency defendant in this action on the subject of agency compensation. There is no evidence of any communications between the Schiff agencies and The New York Times and Time, except in the normal course of placing advertisements.

Ambook employed the Schiff agencies from early 1968 until January 1972. By this time Ambook was nearly out of business. It ceased operations in the middle of 1972.

Although the record does not contain a complete schedule of all of Ambook's advertisements, there is a list of advertisements from January 27, 1968 until May 4, 1970. During this time Ambook placed advertisements in 45 different publications—including The New York Times, Time, New Republic, Atlantic Monthly, Commentary, Saturday Review, Book World, National Observer, New York Review of Books, Harpers, National Jewish Monthly, Catholic Digest, Nation, Ramparts, Scholastic Teacher, Esquire, Ladies Home Journal, Saturday Evening Post, Quinto Lingo, Presbyterian Life.

Ambook placed 12 advertisements in The New York Times Book Review and one advertisement in The New York Times Magazine from February 25, 1968 to January 18, 1969. The New York Times refused to carry any further bookclub plan advertisements for Ambook, because of the multitude of complaints received by the Times about the failure of Ambook to provide what was promised in the advertisements. On February 1, 1970 The New York Times carried an advertisement of selected books offered by "Interbook," which was a trade name used by Ambook.

Ambook placed five advertisements in Time, appearing on the following dates:

January 3, 1969
February 28, 1969
March 7, 1969
January 4, 1971
February 1, 1971.

The Schiff agencies were responsible for the creation and placement of all advertisements, including those in The New York Times and Time. The total cost of the advertisements in The New York Times and Time was $38,677 and $39,895 respectively. The 15% agency commissions allowed by the Times and Time amounted to $5,802 and

$5,984 respectively, which commissions were retained by the Schiff agencies.

Ambook alleges that a total of $387,741 was charged by media for advertising, of which $58,307 was allowed as commissions to the Schiff agencies. In addition, Ambook alleges that the Schiff agencies made certain charges for production, adding commissions for this work in the total amount of $4,145. Ambook contends that it was charged an additional $30,442 in commissions on production items not relating to media advertising, but which related to direct mail solicitation.

With regard to the contention that Ambook was prevented from establishing its own facility for developing advertising, and was "coerced" into dealing with advertising agencies, there is no evidence that Lyman, prior to approaching Pierce and then Schiff, had explored in any way the possibility of Ambook creating its own advertising and placing advertisements directly with magazine and newspaper publishers.

However, Lyman has filed an affidavit stating that, during his college years he had some experience in magazine sales and promotion, and acquired some information about direct mail advertising. Lyman states that he did not in fact require the services of an advertising agency for Ambook. Lyman states in effect that, if Ambook had been able to obtain the 15% commission from publishers, Ambook would have prepared its own advertising, or at most hired an advertising consultant for about one year, and dealt directly with the publishers. His affidavit states:

"10. My understanding of the 15% commission system was the reason I sought to hire a recognized advertising agency and why I contacted Milton Pierce and Victor Schiff. American Book Club needed advertising services and, because of the nature of the 15% commission system, these services were available from a recognized advertising agency at no additional cost above the cost of space in publications.

11. Plaintiff had need of consultants in advertising, finance, bookkeeping, operations (data processing, warehousing and inventory control) and law, but, because of my four years of experience in advertising and my lack of experience in the other areas, the area of advertising was the one least in need of an outside consultant. If it were not for the 15% commission system, that is, if plaintiff had been permitted to pay rates for space in publications net of the 15% agency commission, plaintiff might have hired the services of an outside advertising consultant for about 1 year."

Ambook never approached The New York Times with any request to place advertisements directly and receive the 15% commission. Ambook never sought to discuss with the Times any proposal to set up its own advertising facility through the employment of an outside advertising consultant. Ambook never submitted advertising copy to the Times, or gave the Times any information indicating Ambook's capability with regard to the development of advertising.

The same is true with respect to Time, with a slight qualification. In March 1972, when Ambook was virtually out of business, and after a year had passed since the last of Ambook's five advertisements in Time placed through the Schiff agencies, Lyman of Ambook called Time and asked if Ambook could receive the 15% agency commission. There is no evidence that any information was given to Time about any capability on the part of Ambook to create advertising copy. On March 31, 1972 the credit manager of Time wrote Lyman stating that Ambook did not qualify for the 15% commission.

Ambook has made a contention, which is totally without substance, that the insertion orders given by the Schiff agencies to The New York Times and Time included provisions prohibiting the Schiff agencies from rebating any part of the 15% commissions. Ambook contends that the Schiff agencies were using the 1933 version of the 4A's insertion order form (containing the no-rebate clause), instead of the revised 1956 version (omitting the no-rebate clause).

Ambook's contention is based upon an affidavit from an attorney, who was formerly associated with a law firm which was counsel to Schiff/Brown & Co. This affidavit states that "sometime prior to November 24, 1971" Victor Schiff gave him a blank form of insertion order "as an example of the form of media insertion order used by Schiff/Brown & Co., Inc., at that time." This form was the 1933 version with the no-rebate clause.

However, this attorney has no personal knowledge that this form was actually used. Neither Schiff nor Brown, whose records have been destroyed, can identify it as having been used. Time has produced the actual insertion orders used with respect to that magazine by the Schiff agencies, all of which are on the 1956 forms, omitting the no-rebate provision.

The New York Times has searched for, but has not found, the insertion orders used by the Schiff agencies in ordering advertisements for Ambook. However, the affidavits submitted by the Times deny taking any steps to control the compensation arrangements between advertising agencies and their clients. Moreover, the advertisements of Ambook in the Times were placed before the time that Schiff/Brown & Co. had moved to the address referred to in the blank form insertion order relied on by plaintiff.

## VII.

■ Rule 56 of the Federal Rules of Civil Procedure authorizes motions for summary judgment, and provides in part:

"(c) . . . The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."

Summary judgments are available in antitrust cases to the same extent as they are in other cases. *First National Bank v. Cities Service Co.*, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968).

■ As a general rule, in order to hold a defendant liable for violation of Section 1 of the Sherman Act, the plaintiff must show that, during the four-year limitation period, the defendant was a party to an illegal combination or conspiracy, and that this combination or conspiracy resulted in injury to the business or property of the plaintiff. *Zenith Radio Corp., Inc. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338–39, 91 S.Ct. 795, 28 L.Ed.2d 77 (1971); *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117 (5th Cir. 1975), *cert. denied*, 423 U.S. 1054, 96 S.Ct. 784, 46 L.Ed.2d 643 (1976), 425 U.S. 971, 96 S.Ct. 2166, 48 L.Ed.2d 793 (1976) and 431 U.S. 904, 97 S.Ct. 1697, 52 L.Ed.2d 388 (1977); 517 F.2d 129 (5th Cir. 1975), *cert. denied*, 431 U.S. 904, 97 S.Ct. 1697, 52 L.Ed.2d 388 (1977); *Webster Rosewood Corp. v. Schine Chain Theatres, Inc.*, 263 F.2d 533 (2d Cir.), *cert. denied*, 360 U.S. 912, 79 S.Ct. 1296, 3 L.Ed.2d 1261 (1959).[9] A claim for conspiracy in violation of Section 1 of the Sherman Act

" . . . must be based on some injurious act actually occurring during the limitations period, not merely the abatable but unabated inertial consequences of some pre-limitations action." *Poster Exchange, Inc. v. National Screen Service Corp.*, 517 F.2d 117, 128.

■ Proof of the existence of the combination or conspiracy during the limitation period, and proof of a defendant's membership therein during that period, may involve evidence of events occurring beyond the limitation period, including events about the origin of the conspiracy. But the ultimate issue in a case such as the present one is whether a conspiracy existed, and whether the particular defendant was a member of the conspiracy, during the four-year period.

---

**9.** In the *Zenith* case, *supra*, the Supreme Court held, among other things, that where an antitrust violation outside the limitation period results in speculative and unprovable damages at that time, but causes provable damages which occur later during the limitation period, recovery can be had. This rule has no application to the present case.

■ Ambook contends that the conspiracy which originated in 1917 did in fact continue after the 1956 consent decrees and through the damage period 1968–72, and that all defendants in the case, together with the Schiff agencies and many other parties, were conspirators during the damage period. On the basis of the record on the present motions, viewing the evidence in the light most favorable to Ambook, it must be concluded that there is no evidence which would permit a finding of conspiracy, or membership in a conspiracy by any defendant or the Schiff agencies, during the period 1968–72, or at any time after 1956.

It is assumed that the documentary evidence about the 4A's is admissible against that defendant and that this evidence shows the existence of an antitrust conspiracy by the 4A's with others prior to 1956. However, the consent decree of 1956 expressly prohibited the 4A's from engaging in conspiratorial conduct.

Evidence about efforts by the 4A's to standardize and prevent exceptions to the 15% commission system relates entirely to the period before 1956. There is no evidence of such activity after 1956. There is no evidence of any illegal activity whatever by the 4A's after 1956.[10]

The fact that numerous publishers continued to grant the 15% agency commission after 1956, and the fact that numerous advertising agencies retained the commission as compensation for services to their clients—these circumstances are insufficient, as a matter of law, to impose liability on the 4A's in this action. The 4A's was not responsible for supervising the conduct of publishers and agencies after 1956, and indeed it would have been a violation of the law if the 4A's had tried to do so.

Since there is no evidence that the 4A's either promoted or joined in any conspiracy during the period 1968–72, or at any time after 1956, the 4A's is entitled to summary judgment dismissing the complaint as to it.

■ Following the 1956 consent decrees, publishers, advertising agencies and advertisers were free to use, or not to use, the 15% commission. There was no legal requirement that any party abandon the commission, or change it to a higher or lower rate. Of course, it was illegal either before or after 1956 to have the use of the commission or its amount fixed or enforced by conspiracy.

There is no evidence that, following 1956, the conspiracy which had been led by the 4A's was carried on by anyone else. There is no evidence that any trade association, or any advertising agencies or publishers, undertook any activities to maintain or enforce uniform practices. There is no evidence of conspiratorial communications or agreements among advertising agencies, among publishers, or between publishers and agencies. Certainly there is no evidence of any such conduct on the part of the agency and publisher defendants in this case—Young & Rubicam, BBDO, J. Walter Thompson, The New York Times and Time.

The undisputed evidence is that, following the 1956 consent decrees, normal market pressures came into play to break down the uniformity of the 15% commission system which the 4A's had attempted to achieve, apparently with considerable success. Numerous advertising agencies, including the three agency defendants in this action, offered compensation arrangements to their clients which departed from the use of the 15% commission. Newspaper and magazine publishers granted the 15% commission to "house agencies." The New York Times and Time evolved their individual policies along this line commencing in the 1960's, and it must be assumed that they were not alone.

These developments were matters of common knowledge, publicized in trade publications and elsewhere. There is no evidence of any conspiracy to halt them.

---

10. *See International Railways of Central America v. United Brands Co.*, 532 F.2d 231, 240 (2d Cir.), *cert. denied*, 429 U.S. 835, 97 S.Ct. 101, 50 L.Ed.2d 100 (1976).

"Whatever teeth the 'monopolist' had were drawn by the 1958 consent decree . . . ."

It is, of course, true that after 1956, newspaper and magazine publishers continued to grant the 15% commission to advertising agencies, and this commission would not normally be available to advertisers—at least to those who did not have some facility or "house agency" capable of producing advertising. It is also true that after 1956, advertising agencies continued, to a substantial degree, to look to the 15% commission for their compensation for services to their clients.

■ But these basic practices had been used by many publishers and advertising agencies long before the appearance of the 4A's in 1917 (albeit without the standardization of the 15% as the amount of the commission). There is no inherent reason why these practices would not continue to be used by many publishers and agencies after 1956 in the absence of any conspiracy. Indeed, there are valid economic reasons why many publishers, after 1956, might continue to set the rate of the commission at 15%, without a conspiratorial agreement to do so. *See* Turner, *The Definition of Agreement Under The Sherman Act: Conscious Parallelism and Refusals to Deal,* 75 *Harvard L.Rev.* 655, 659 (1962). It is the settled rule that parallel conduct is not in and of itself a violation of Section 1 of the Sherman Act. *Theatre Enterprises, Inc. v. Paramount Film Distributing Corp.,* 346 U.S. 537, 541, 74 S.Ct. 257, 98 L.Ed. 273 (1954); *Modern Home Institute, Inc. v. Hartford Accident and Indemnity Co.,* 513 F.2d 102, 110 (2d Cir. 1975). There must be evidence, either direct or circumstantial, that the parallel conduct involves agreement or conspiracy. In a given case the distinction between legal parallel conduct and conspiracy may be a fine one; nevertheless there is a distinction.

In the present case the distinction between legal parallel conduct and conspiracy is not difficult to draw. The conspiracy involved certain clear-cut organizing activities by the 4A's and other trade associations. These activities were enjoined in 1956, and, as far as the evidence in this case shows, ceased thereafter. Publishers and advertising agencies were free after the consent decrees to continue or not to continue using the 15% commission. To some extent the 15% commission continued in use; to some extent its use was abandoned or changed. To the extent that parallel conduct occurred after 1956, this is not sufficient to demonstrate the existence of a conspiracy.

■ Ambook contends that the agency defendants and Time engaged in conspiratorial conduct in respect to the events of 1970 previously described. This contention has no substance. The undisputed facts are that Time was making an independent reexamination of the 15% commission. Time, among other things, consulted with representative advertising agencies with whom Time did business in normal course and advertisers who advertised in Time, to determine what their views would be on the possible discontinuance of the 15% commission. The agencies naturally indicated a desire that the commission continue. On the other hand, there was no counterpressure from advertisers, seeking to deal directly with Time and to have the agency commission discontinued. Time made a decision based upon marketing factors—to continue to grant the commission to the agencies, upon whom Time obviously depended for much of its advertising revenues. At the same time, Time decided to liberalize its recognition of house agencies. There was no conspiratorial agreement between Time and the agencies, nor do the events provide evidence of the existence of a broader conspiracy, as alleged by Ambook.

Certain additional observations are required with respect to the Schiff agencies and the publisher and agency defendants.

The Schiff agencies are crucial to the case, since they are the parties with whom Ambook actually dealt. If there were any excessive, conspiratorially fixed, charges for advertising, it was the Schiff agencies who made those charges. However, as already noted, they are not being sued. Moreover, there is no evidence that they were parties to any conspiracy to fix the amount or terms of the compensation to be received

from Ambook. Schiff's agencies were not members of the 4A's. There is no evidence that they had any communications with any defendant in this action regarding their compensation arrangements with Ambook. The fact that the Schiff agencies had heard about the use of the 15% commission in the industry is not sufficient to subject any defendant in this case to liability with respect to what the Schiff agencies charged to Ambook.

There is no evidence sufficient to permit a finding that any of the agency defendants was a party to a combination or conspiracy injuring the business or property of Ambook during the period 1968–72. Young & Rubicam, BBDO, and J. Walter Thompson are entitled to summary judgment dismissing the complaint as to them.

Finally, it is necessary to deal with the argument of Ambook that The New York Times and Time, pursuant to conspiracy, failed to make available the 15% commission to Ambook, thus economically coercing Ambook to deal with advertising agencies. There is no evidence sufficient to permit a finding that either The New York Times or Time was a party to a conspiracy in 1968–72 with respect to the 15% commission. In any event, Ambook dealt with the Schiff agencies because of its own decision. The New York Times and Time are not responsible, or liable, for that decision. The New York Times and Time are entitled to summary judgment dismissing the complaint as to them.

### Conclusion

The motions of defendants American Association of Advertising Agencies, Inc., Young & Rubicam, Inc., Batten, Barton, Durstine & Osborn, Inc., J. Walter Thompson Company, The New York Times Company, and Time Incorporated for summary judgment dismissing the complaint are granted.

Defendants should settle an appropriate judgment.

So ordered.