612 F.2d 604
 1979-2 Trade Cases 62,979, 5 Media L. Rep. 1989
 AMBOOK ENTERPRISES, a/k/a American Book Club, on behalf of
itself and all others similarly situated,
Plaintiff-Appellant,
v.
TIME INCORPORATED, New York Times Company, J. Walter
Thompson Co., Young & Rubicam International, Inc., Batten,
Barton, Durstine & Osborn, Inc., American Association of
Advertising Agencies, Inc., Defendants-Appellees.
 No. 1105, Docket 79-7184.
 United States Court of Appeals,
Second Circuit.
 Argued May 31, 1979.
Decided Oct. 29, 1979.
 
 Daniel J. Kornstein, New York City (Cletus P. Lyman, and Richard A. Ash, Lyman & Ash, Philadelphia, Pa., of counsel), for plaintiff-appellant, Ambook Enterprises.
 Floyd Abrams, New York City (Cahill, Gordon & Reindel, New York City, P. Kevin Castel, New York City, of counsel), for defendant-appellee The New York Times Company.
 Paul, Weiss, Rifkind, Wharton & Garrison, New York City (Sidney S. Rosdeitcher, and Jack A. Horn, New York City, of counsel), for defendant-appellee Young & Rubicam, Inc.
 Cravath, Swaine & Moore, New York City (Frederick A. O. Schwarz, Jr., Richard M. Hirsch, and Ronald P. Mysliwiec, New York City, of counsel), for defendant-appellee Time Incorporated.
 Breed, Abbott & Morgan, New York City (David S. Patterson, Donald B. Da Parma, New York City, of counsel), for defendant-appellee J. Walter Thompson Company.
 Lunney & Crocco, New York City (J. Robert Lunney, Michael J. McAllister, and Luigi P. De Maio, New York City, of counsel), for defendant-appellee Batten, Barton, Durstine & Osborn, Inc.
 Donovan, Leisure, Newton & Irvine, New York City (Thomas R. Trowridge III, and John K. Hendricks, New York City, of counsel), for defendant-appellee American Association of Advertising Agencies, Inc.
 Before MOORE, FRIENDLY and FEINBERG, Circuit Judges.
 FRIENDLY, Circuit Judge:
 
 I.
 
 1
 This private antitrust action was commenced on June 1, 1972, in the District Court for the Eastern District of Pennsylvania. Plaintiff Ambook Enterprises a/k/a American Book Club (Ambook) is a Pennsylvania partnership which was organized to engage in the retail and wholesale selling of books and records in interstate commerce. The partners were two corporations, L-Club Corporation and American Book Club. L-Club Corporation is owned by eight persons connected with a highly regarded New York investment firm; an affidavit filed on its behalf states that this action has not been authorized by it.[1] American Book Club is owned by three individuals, one of them Cletus P. Lyman, a Philadelphia attorney, whose firm, Lyman & Ash, was counsel of record when the action was brought and has participated in its prosecution, although New York counsel has now been substituted. Ambook, which began operations in January, 1968 and conducted them as a partnership since December, 1969, discontinued these in mid-1972, shortly after this action was brought.
 
 
 2
 The defendants are Time Incorporated (Time), publisher of the well-known weekly magazine of that name; the New York Times Co. (N.Y. Times), publisher of the nation's foremost newspaper; four of the country's largest advertising agencies, J. Walter Thompson Co. (JWT); Young & Rubicam International, Inc. (Y & R); Batten, Barton, Durstine & Osborn, Inc. (BBD&O); and Ted Bates & Company, Inc. (Bates);[2] and American Association of Advertising Agencies (4As), a trade association engaged in formulating policies for and promoting its members including the above-named agency defendants. Ambook placed advertisements with Time and N.Y. Times, and 43 other non-defendant publications, but had no dealings with JWT, Y&R, BBD&O or Bates. It placed its ads at various times through three interrelated agencies, Newmark, Posner & Mitchell, Inc., Victor Schiff & Co. (a "division" of the Kaplan Agency), and Schiff/Brown & Co. (hereafter collectively referred to as Schiff-Brown),[3] none of which was named as a defendant.
 
 
 3
 Ambook sought in an amended complaint to bring the action "individually and in a representative capacity on behalf of the class of all similarly situated advertisers, namely, producers, wholesalers and retailers of goods and services in interstate commerce in the United States who advertise in publications." The gravamen of the complaint was that by agreement between the two named publishers and countless others, the 4As, the named agencies and countless others, plaintiff and the class it wished to represent had been forced to utilize the services of advertising agencies, since the publishers granted the agencies a uniform discount of 15%, whereas any advertiser who wished to place an advertisement directly with the publisher was forced to pay the charges set in rate cards, which were 17.6%[4] above the rates charged the agencies and, in addition, pay the costs of various services many of which were furnished by the agencies and paid for by them out of the 15% Discount. The complaint alleged that as a result of this conspiracy Ambook had paid the two publisher defendants $4,000 and other "conspirator publications" $20,000 more than if it had been able to receive the 15% Discount and pay its own expenses for doing what Schiff/Brown did. The corresponding figures for the class were estimated as at least $30 million for Time and the N.Y. Times and $300 million for unnamed "conspirator publications". Damages were sought against all defendants in an amount in excess of $500,000 for Ambook and in excess of $1 billion for members of the class. Injunctive relief was also requested. The District Court for the Eastern District of Pennsylvania transferred the action, pursuant to 28 U.S.C. § 1404, to the District Court for the Southern District of New York where it was assigned to Judge Griesa.
 
 
 4
 In February, 1973, Time moved for a determination that the action could not be maintained as a class action. Ambook cross-moved for an order which, Inter alia, would allow the filing of a second amended complaint and would determine that the action should proceed as a class action. One count in the proposed second amended complaint was based on the Robinson-Patman Act, 15 U.S.C. § 13. As a result of a hearing, Ambook submitted a revised definition of classes. This narrowed the field to three damage subclasses and one injunctive class. The damage subclasses were all advertisers in Time from January 1, 1968, all advertisers in the N.Y. Times excluding classified and retail advertisers from the same date, and all motion picture advertisers in the N.Y. Times from the same date;[5] the injunctive class consisted of "(a)ll persons and entities who have advertised or who are likely to advertise in the future in the publications" of Time and the N.Y. Times.
 
 
 5
 In a considered opinion, 60 F.R.D. 476 (S.D.N.Y.1973), Judge Griesa held that the action could not be maintained as a class action. Agreeing with that determination, we see no need to discuss all the reasons the judge gave for it. It suffices that Ambook was out of business and that there was no assurance that it was "in a position to carry on class litigation in this Court in a responsible and vigorous manner", 60 F.R.D. at 487; that Ambook had no dealings with the four agency defendants whom it had named and thus might stand differently from advertisers who had; and that, as subsequent discussion will reveal, much may hang on the ability of a particular advertiser to have established an "in house" advertising organization which the publishing defendants might have recognized or to perform equivalent services. The judge denied the motion to file the proposed second amended complaint without prejudice to a motion to file a further pleading devoid of class action allegations. An appeal to this court was dismissed for want of appellate jurisdiction, even under the "death-knell" doctrine then prevailing in this circuit but subsequently rejected by the Supreme Court in Coopers & Lybrand v. Livesay, 437 U.S. 463, 98 S.Ct. 2454, 57 L.Ed.2d 351 (1978).
 
 
 6
 Plaintiff thereupon moved for leave to file a second amended complaint without class action allegations. The court granted this, with two exceptions. It struck a claim of discrimination under the Robinson-Patman Act on the ground that that statute deals only with the sale of commodities, and prayers for injunctive relief under 15 U.S.C. § 25, since § 25 refers only to suits by the United States, and 15 U.S.C. § 26, authorizing injunctive relief for private parties "against threatened loss or damage by a violation of the antitrust laws", since Ambook had been out of business since mid-1972 and was in the process of liquidation.
 
 
 7
 Although the quondam action for a billion dollars in damages and a sweeping injunction had thus dwindled to a relatively small damage suit on its own behalf, Ambook continued to pursue it with considerable vigor. After extensive pretrial proceedings, defendants moved for summary judgment in June, 1976, which was denied a year later, primarily on the ground of lack of sufficient evidence concerning the relationship between Ambook and Schiff-Brown, 464 F.Supp. at 1129-30. After further discussion of the issues, Ambook designated the witnesses it would call on that issue at a trial of the action. These were Victor Schiff and Stephen Brown, the principals of the three advertising agencies Ambook had used; K. Elia Georgiades, a former Vice President of Ambook; and Milton Pierce, a person in the advertising business who had introduced Ambook to Schiff. Their depositions were taken and plaintiff accepted their testimony as true except as noted in a letter of plaintiff's attorney dated March 24, 1978, which also indicated that Ambook might call an economist to testify what fees might be paid to advertising agencies in a free market environment.
 
 
 8
 On May 1, 1978, defendants renewed their motion for summary judgment. The court granted this on January 11, 1979, in a lengthy and reasoned opinion, 464 F.Supp. 1127. Plaintiff has appealed.
 
 II.
 
 9
 It will be convenient to deal at the outset with Ambook's contention that the court erred in striking its claim under the Robinson-Patman Act.
 
 
 10
 The Robinson-Patman Act, so far as here pertinent, makes it unlawful:
 
 
 11
 for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality, where either or any of the purchases involved in such discrimination are in commerce, where such commodities are sold for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, and where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.
 
 
 12
 The question whether this applies to the sale of newspaper advertisements has not been determined by the Supreme Court, Times Picayune Pub. Co. v. United States, 345 U.S. 594, 609-10 n. 27, 73 S.Ct. 872, 97 L.Ed. 1277 (1953) (dealing with similar language in § 3 of the Clayton Act), or by this court, Syracuse Broadcasting Corp. v. Newhouse, 236 F.2d 522, 527 (1956).
 
 
 13
 National Tire Wholesale, Inc. v. Washington Post Co., 441 F.Supp. 81, 84-86 (D.D.C.1977), Aff'd 194 U.S.App.D.C. 81, 595 F.2d 888 (D.C.Cir.1979), squarely held as the district court had done here, that newspaper advertising was not a "commodity" under the Robinson-Patman Act. The same result was reached in interpreting the term "commodity" under § 3 of the Clayton Act, 15 U.S.C. § 14, in ALW, Inc. v. United Air Lines, Inc., 510 F.2d 52 (9 Cir. 1975). Many other relevant cases, although less directly in point, have taken a strict view of the meaning of the term "commodities".[6]
 
 
 14
 As against all this Ambook relies on a recent opinion of the Federal Trade Commission, CCH FTC Complaints and Orders P 21,448 in The Times-Mirror Co., (July 27, 1978), that the Robinson-Patman Act applies to the sale of retail newspaper advertising, to which a district court deferred in Sun Communications, Inc. v. Waters Publications, Inc., 466 F.Supp. 387, 390-91 (W.D.Mo.1979). We decline to accord similar deference. The FTC opinion runs directly contrary to a statement by one of the bill's sponsors during the debate on the floor of the Senate:
 
 
 15
 Mr. Gore. I should like to ask the Senator from Kentucky what application the provision now under discussion would have to newspapers which merely act as advertising mediums or agencies. Would it prevent a differential charge on their part respecting advertisers, based on or measured by the amount of advertising carried?
 
 
 16
 Mr. Logan. No. (80 Cong.Rec. 3115, 3119 (March 3, 1936)) (emphasis added); See also 79 Cong.Rec. 9078-79 (June 11, 1935); H.R. 8277, 85th Cong., 1st Sess. (1957), discussed in Kennedy Theater Ticket Service v. Ticketron, supra, 342 F.Supp. at 926.
 
 
 17
 It also runs counter to a statement by Representative Patman in a book written only two years after passage of the Act, The Robinson-Patman Act, p. 75 (1938). We recognize that "post-passage remarks by legislators, however explicit, cannot serve to change the legislative intent of Congress expressed before the Act's passage." Regional Rail Reorganization Act Cases, 419 U.S. 102, 132, 95 S.Ct. 335, 353, 42 L.Ed.2d 320 (1974). But here the term "commodities", in the ordinary use of language, would not be taken to include newspaper advertising. To regard advertisements as commodities would involve almost insolvable problems in determining whether these were of "like grade and quality". See Baum v. Investors Diversified Services, Inc., supra, 409 F.2d at 875. The page of the newspaper, the month, the day of the week, and many other factors would have to be weighed in answering this question, as well as in determining defenses allowed by the Act. Whatever the rule as to the deference to be accorded an agency's interpretation of a statute it has the duty to administer, see Federal Trade Comm'n v. Colgate-Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 13 L.Ed.2d 904 (1965), "this is a case where understanding of the statute depends in no small measure on prior judicial decisions and legislative history subjects on which a court has a greater competence than the agency." Pittston Stevedoring Corp. v. Dellaventura, 544 F.2d 35, 50 (2 Cir. 1976), aff'd Sub nom. Northeast Marine Terminal Co. v. Caputo, 432 U.S. 249, 97 S.Ct. 2348, 53 L.Ed.2d 320 (1977). The FTC's purported discovery, forty-two years after the event, of a meaning in the Robinson-Patman Act contrary to the ordinary reading of the language, disavowed on the floor of the Senate, disclaimed by the statute's principal author two years after its passage, raising grave problems of administration, and contrary to the consistent course of judicial decision on this and related matters, is a discovery of something that is not there. See Romero v. International Terminal Operating Co., 358 U.S. 354, 370-71, 79 S.Ct. 468, 3 L.Ed.2d 368 (1959).
 
 III.
 
 18
 Turning to the claim under § 1 of the Sherman Act, we find no occasion for recapitulating at length the learning on the use of summary judgment in antitrust cases expressed in such leading decisions as Poller v. C.B.S., 368 U.S. 464, 467-73, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962), on the one hand, and First National Bank of Arizona v. Cities Service Co., 391 U.S. 253, 289-90, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), on the other.[7] Still a few preliminary observations may be in order. The defendants stress that this is not a case where summary judgment was granted on affidavits alone. The parties engaged in extensive discovery including a number of depositions, although, as will appear, there was at least one question of credibility on a point of some importance. However, there is still the point that the body having the ultimate power to draw inferences, in this instance a jury, did not see and hear the witnesses. Summary judgment for the defendants can be sustained in such a case if but only if the reviewing court is satisfied that a properly instructed jury, giving full weight to plaintiff's evidence, drawing every reasonable inference in its favor,[8] and subjecting defendants' evidence to a critical eye,[9] could not rationally have found that plaintiff was entitled to any relief.
 
 
 19
 Since defendants submitted evidence contradicting Ambook's allegations, it was incumbent upon Ambook to provide some evidentiary support for its complaint, Fed.R.Civ.Pro. 56(e); First National Bank of Arizona v. Cities Service Co., supra, 391 U.S. at 289, 88 S.Ct. 1575, although this evidence did not have to be such as would require resolution of the substantive issues in Ambook's favor. Recognizing this, Ambook has not merely relied on its allegations but has submitted evidence.[10] The question is of its quality. As put in Cities Service, did plaintiff's case remain devoid "of Any significant probative evidence tending to support the complaint"? 391 U.S. at 290, 88 S.Ct. at 1593 (emphasis supplied).
 
 
 20
 Defendants' primary contention is that Ambook's evidence would not permit the finding of a "contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade" during the period from June 1, 1968 to June 1, 1972. There was an abundant showing that one had existed earlier. The record is replete with evidence that a prime objective of the 4As, organized in 1917, with JWT and a predecessor of BBD&O as members, was to perpetuate a dual price system. Advertisers dealing directly with the media would be charged a full card rate, whereas in the case of those employing recognized agencies, the latter would receive a 15% Deduction no more, no less none of which was rebated to the advertiser.[11] Advertisers were thus economically forced to utilize agencies, who would receive and retain 15% Of the card rate as reimbursement for the services they performed; to the extent that the advertiser could have performed these services for less, the conspiracy increased his cost of advertising by the difference.[12] The only exception was that a few large advertisers apparently had sufficient muscle that they were allowed to have "in house" agencies, who were treated in the same way as the independents.
 
 
 21
 This system was threatened when, on May 12, 1955, the United States filed a civil antitrust action in the District Court for the Southern District of New York. The defendants were the 4As and five media associations. The complaint alleged a number of conspiracies which we set forth in the margin.[13]
 
 
 22
 In May 1956 the Government entered into a series of consent decrees with each of the defendants. These recited that no testimony had been taken and that defendants were consenting to the entry of judgment "without trial or adjudication of any issue of fact or law herein and without any findings of fact." The decree was to apply not only to each defendant and its officers, servants, employees, etc. but also "to any committee or groups of consenting defendant's membership when organized and functioning as committees or groups of consenting defendant, and to all other persons in active concert or participation with it who receive actual notice of the Final Judgment by personal service or otherwise." By paragraph IV A each defendant was
 
 
 23
 enjoined and restrained from entering into, adhering to, promoting or following any course of conduct, practice or policy, or any agreement or understanding:
 
 
 24
 (1) Establishing or stabilizing agency commissions, or attempting so to do;
 
 
 25
 (2) Requiring, urging or requesting any advertising agency to refrain from rebating or splitting agency commissions;
 
 
 26
 (3) Requiring, urging or requesting any media to deny or limit credit or agency commission due or available to any advertising agency;
 
 
 27
 (4) Establishing or formulating, or attempting to establish or formulate, any standards of conduct or other qualifications to be used by any media or any association of media to determine whether media should or should not do business with or recognize any advertising agency;
 
 
 28
 (5) Requiring, urging or requesting any media not to do business with or not to recognize any advertising agency;
 
 
 29
 (6) Establishing or stabilizing advertising rates to be charged advertisers not employing an advertising agency, or attempting so to do;
 
 
 30
 (7) Requiring, urging or requesting any media to adhere to publisher advertising rates or rate cards.
 
 
 31
 By paragraph IV B each defendant was likewise enjoined and restrained from
 
 
 32
 requiring, urging or requesting any of its members to engage in any activities covered by Paragraphs (1) through (7) of subsection (A) of this Section IV.
 
 
 33
 The record leaves no doubt that many of the practices alleged by the Government in 1955 to have violated § 1 have since been eliminated.[14] Taking item IV A (2) in particular, the evidence demonstrates that there is no longer any policy of urging or requesting any advertising agency "to refrain from rebating or splitting agency commissions." At least eight types of compensation arrangements between advertisers and agencies are now in effect,[15] although the record does not show their relative frequency or much else about them. Quite clearly there is no agreement among agencies not to solicit business from customers of their rivals, as was alleged in paragraph (B). There was, however, evidence from which a jury could conclude that a number of the practices alleged in the 1955 complaint still exist. Agency "commissions" remain a uniform 15%. Some standards are still being prescribed to determine which agencies will qualify for recognition as house agencies. And advertisers not employing a recognized agency, outside or house, are still being charged at card rates with no variance or discount available for performing the services provided by agencies. A jury could rationally conclude from the evidence here adduced that during the damage period substantially all advertising agencies and the publishing media pursued a plan whereby if a national advertiser approached a newspaper or magazine, he would typically be told that if he were willing to deal through a recognized agency, the agent would receive a 15% Deduction but that otherwise he would be charged the full card rate. While the 15% Deduction could play a part in negotiations between the advertiser and the agent as to the compensation the latter would receive, the record is silent how far most advertisers were aware of this. The only exception to this, if in fact it be one, was that some members of the media, including the two media defendants here, to a limited extent hereafter described, would allow the advertiser to establish a "house agency" which would be treated as an independent would have been. The critical question is whether a rational trier of facts could find that this plan was the result of an agreement among and between the media and the advertising agencies rather than representing independent identical decisions by hundreds of newspapers and magazines. See 2 Areeda and Turner, Antitrust Law § 317(e), at 82 (1978).
 
 
 34
 The leading case for the proposition that an agreement can be inferred from commonality of the conduct is Interstate Circuit, Inc. v. United States, 306 U.S. 208, 59 S.Ct. 467, 83 L.Ed. 610 (1939). In that case, Interstate and Consolidated, two affiliated large chains of motion picture exhibitors, who heavily dominated a portion of the Texas motion picture market, sought an agreement from a group of motion picture distributors that was designed to weaken competition the exhibitors faced from nonaffiliated motion picture houses in the area. Specifically, Interstate and Consolidated advised distributors that they would not purchase films for exhibition in their theaters unless the distributors accepted two constraints. These were that in selling the distributor's product for subsequent runs the minimum admission price to adults in the evening should be 25 cents and that its pictures exhibited at a night admission of 40 cents or more should never be exhibited as double features. As a result of conferences between Interstate and Consolidated and eight distributors, the latter accepted these conditions with respect to four of the six Texas cities served by Interstate. The obvious result of such a joint action by the distributors was to weaken the ability of the nonaffiliated exhibitors to draw audiences away from Interstate and Consolidated by offering substantially lower prices or double features.
 
 
 35
 Despite a lack of any express evidence that the various distributors actually agreed among themselves to abide by the demands of Interstate and Consolidated, the Court upheld the district court's finding of a conspiracy among the distributors, noting that "without substantially unanimous action with respect to the restrictions for any given territory there was a risk (to any distributor) of a substantial loss of the business and good will of the subsequent-run and independent exhibitors, but that with it there was the prospect of increased profits," Id. at 222, 59 S.Ct. at 472. In the instant case, a conspiracy among the media could be similarly inferred. In the absence of agreement, a magazine or newspaper refusing the lower rate to advertisers willing to perform the services rendered by agencies ran the risk of losing such advertising to any medium that did; indeed, one could conclude it was the threat of this that led a number of the media to grant the 15% Discount to a few house agencies.[16] In addition, as is more fully developed below, a magazine or newspaper refusing to adhere to the dual rate system faced serious risks of reprisal from powerful agencies influencing a large section of the market.
 
 
 36
 In Interstate Circuit the Court also stressed the failure of the distributors "to tender the testimony, at their command, of any officer or agent of a distributor who knew, or was in a position to know, whether in fact an agreement had been reached among them for concerted action," Id. at 225, 59 S.Ct. at 474. Noting that only local managers had been called, rather than those who had authority to act, the Court thought this "persuasive that their testimony, if given, would have been unfavorable . . . ." Here the media offered no evidence to show what legitimate business advantage, save continuity and fear of reprisal, inhered in the dual rate system. No independent reason was offered for one of the media's not doing what could be thought to be in its own self-interest offering the lower rate to direct advertisers who performed the same service for which agencies received discounts as a means of increasing the offeror's share of the direct advertising market.
 
 
 37
 In United States v. Paramount Pictures, Inc., 334 U.S. 131, 142, 147, 68 S.Ct. 915, 922, 92 L.Ed. 1260 (1948), the Court found the point of drawing an inference of agreement from conscious parallelism scarcely deserving of elaboration. It contented itself with such remarks as:
 
 
 38
 It is not necessary to find an express agreement in order to find a conspiracy. It is enough that a concert of action is contemplated and that the defendants conformed to this arrangement,
 
 
 39
 and "the defendants either participated in evolving this uniform system of clearances or acquiesced in it and so furthered its existence."
 
 
 40
 The authority of these cases was not weakened by Theatre Enterprises, Inc. v. Paramount Film Distributing Corp., 346 U.S. 537, 74 S.Ct. 257, 98 L.Ed. 273 (1954). There a suburban theatre in a small shopping district near Baltimore complained of the judge's refusal to direct a verdict in its favor because a number of motion picture distributors and exhibitors had declined to grant it first run privileges, sought originally on an exclusive and later on a non-exclusive so-called "day and date" basis. The defendants advanced a multitude of substantial business reasons why the grant of first run privileges to the petitioner was counter to their individual business interests. It was in this context of upholding refusal to direct a plaintiff's verdict that Mr. Justice Clark observed, 346 U.S. at 541, 74 S.Ct. at 259:
 
 
 41
 this Court has never held that proof of parallel business behavior conclusively establishes agreement or, phrased differently, that such behavior itself constitutes a Sherman Act offense. Circumstantial evidence of consciously parallel behavior may have made heavy inroads into the traditional judicial attitude toward conspiracy; but "conscious parallelism" has not yet read conspiracy out of the Sherman Act entirely.
 
 
 42
 This explanation of how the inference from parallel conduct can be explained away by proof of legitimate business considerations[17] was repeated in First National Bank of Arizona v. Cities Services Co., supra, 391 U.S. at 286-88, 88 S.Ct. 1575 (1968). In line with this analysis is our own decision in Modern Home Institute, Inc. v. Hartford Accident & Indemnity Co., 513 F.2d 102, 111 (2 Cir. 1975), holding that summary judgment for defendants had been properly granted in a case where any inference from "conscious parallelism" had been overwhelmed by defendants' evidence of independent interest in refusing to deal with the plaintiff. As good a recent statement on the subject of conscious parallelism as any is Chief Judge Seitz' in Bogosian v. Gulf Oil Corp., 561 F.2d 434, 446 (3 Cir. 1977), Cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978), that:
 
 
 43
 proof of consciously parallel business behavior is circumstantial evidence from which an agreement, tacit or express, can be inferred but that such evidence, without more, is insufficient unless the circumstances under which it occurred make the inference of a rational, independent choice less attractive than that of concerted action.
 
 
 44
 Here defendants have offered no explanation why over a period of decades none of the media has engaged in the slightest experimentation in its rate structure in the respects here material. No explanation has been offered why uniform discounts were given to agencies but no discount (except by the house agency device) was given to advertisers willing to perform some or all of the agency services. There is no room for the argument against the significance of conscious parallelism which has been made in the case of an oligopolistic market with an inelastic demand, namely, that any downward price move would immediately become known to and put in effect by competitors, so that the result would be disadvantageous to all.[18] The very number of competitors, among both the media and the agencies, argues against the claim that any price movement, however limited, would be immediately followed by everyone, so that its originator would derive no benefit. It is true that after the 1956 consent decrees there was opportunity for bargaining on price, not between the advertisers and the media but between the advertisers and the agencies. However, while the record demonstrates that a variety of arrangements were developed, see note 15 Supra, it conveys no idea how extensively these were used, see National Lead Co. v. F. T. C., 227 F.2d 825, 833 (7 Cir. 1955), rev'd on other grounds, 352 U.S. 419, 77 S.Ct. 502, 1 L.Ed.2d 438 (1957), and particularly how available they were to advertisers like Ambook as distinguished from great national concerns. In any event, we have been cited to no authority that would support the proposition that a § 1 conspiracy to prevent advertisers from placing ads directly or at least greatly to impair their ability to do so can be cured by the possibility that some might obtain similar financial results by subsequent bargaining with the agencies. The advertiser's bargaining position with the agency was weakened by the conspiracy in his not being able to bargain with the publishers themselves for reductions based on provision of similar services and by the agency's approaching the bargaining table with him with the 15% Reduction already in hand.
 
 
 45
 In the Cities Service case, the Court indicated that one factor to consider in determining if agreement should be inferred from parallel conduct was whether agreement benefited the alleged conspirators as the practice in Interstate Circuit clearly had, 391 U.S. at 286-87, 88 S.Ct. 1575, cf. also Overseas Motors, Inc. v. Import Motors Limited, Inc., 375 F.Supp. 499, 534 (E.D.Mich., 1974), Aff'd, 519 F.2d 119 (6 Cir.), Cert. denied, 423 U.S. 987, 96 S.Ct. 395, 46 L.Ed.2d 304 (1975). Here there can be no question that the agencies were benefited. The effect of the parallel conduct was to give advertisers a powerful incentive to use agencies when they might otherwise have preferred to perform some or all of the agency services themselves. The 15% System also benefited the agencies by the peace and quiet of a uniform pricing policy on the part of the media, with competition among the agencies for the business of advertisers being on the basis of quality, salesmanship, or contacts, rather than of their ability to obtain a lower price from the media. These advantages depended, as in Interstate Circuit, upon substantially uniform acceptance.
 
 
 46
 Admittedly the advantages to the media are more problematic. The dual rate agreement did benefit the media in the higher rate paid by the occasional transient direct advertiser, but the effect of the system was to reduce such advertising as much as possible. However, while Cities Service teaches that parallel conduct is less probative of an agreement if there is no benefit to the alleged conspirators therefrom, the Court specifically declined to consider the question of Coerced parallelism.[19] Here the evidence of conscious parallelism can be joined with evidence of coercion in further support of an inference of agreement.
 
 
 47
 In 1970, Henry Luce III, publisher of Time, asked a committee to examine and report on how to eliminate the agency commission.[20] The committee's study included interviews with advertisers, advertising agencies (including Y&R and BBD&O), and magazine competitors. The committee's report concluded there were several options eliminating, reducing, or increasing the commission or leaving it as it was. The committee recommended the latter. Increasing the commission would cost more in revenues than it would gain in increased business from agencies; elimination or reduction by a particular magazine, even such a leader as Time, would cause a risk that agencies would channel business away.
 
 
 48
 Although there is nothing particularly damaging in these recommendations, if considered alone, the report is significant in two other contexts. The first is its candid picture of conditions in the advertising world. Some large advertisers reported there was no longer any real need for the agencies. One advertising executive, although speaking mainly of television, said his firm worked directly with a production firm to make the ads, creative work being done either in house or by competing "boutiques". His company was fighting its "biggest agency to get on a fee system so they don't get richer than they already are. Trouble is the president of our firm and of the agency are close friends and the latter so far has fought a successful rear guard action." The same executive "couldn't care less whether TIME eliminates the agency commission except that perhaps it might hasten the demise of the system." Another function of the agency procuring space was being taken over by independent media buying services (IMBOs). The report recited numerous "indications that some big clients would like to see the agency commission system eliminated." The reason was that in many cases the client was getting ahead of the agency both in ability to create advertising and in knowledge of available media. As against this, the commission system kept costs in line with sales volume, and was convenient and easy to administer. A symposium in a media publication, attended by many elements of the trade, reported a host of different views about the 15% Commission. Several clients of Time were interviewed. One thought abolition of commissions was right in concept, wrong until the details of a new system were worked out. Another favored abolition but did not have much at stake since he already had his agencies on fees. Two airlines thought the time for abolition was not ripe since they already had so many problems on their hands. There was mixed reaction from the automobile industry. Expectably the agencies exhibited greater enthusiasm for maintenance of the present system. Competing magazines were equivocal; they were concerned about their position with the agencies although one conceded that "if a major, major client like Ford or General Motors said he wanted to order direct and pay his agencies in its own manner, the publication would probably go along."
 
 
 49
 The second way in which Time's investigation was significant was that certain agencies did not content themselves with answering the questions they were asked but made it evident that the fears of reprisal by the agencies were real. While Time management was considering the report, Edward L. Bond, Jr., Chairman of Y&R wrote Bernard M. Auer, Executive Vice President of Time, on September 24, 1970, expressing concern over Time's considering a discontinuation of the 15% Agency commission. Although he recognized that "there are some advertisers who would like to see this policy changed", he thought any such move by Time "would appear to gradually erode the full-service agency concept." He added:
 
 
 50
 It seems to us that a policy decision made by the leader in the industry can only increase the likelihood of putting magazines in a bid and ask situation. This will give everyone great concern as to the stability of magazines and the real determination of value received
 
 
 51
 language which a jury could take to be a veiled threat that cessation of the 15% Commission by magazines would accelerate the trend toward advertising on television at the expense of the printed word. Finally
 
 
 52
 I hope you will review this subject once more in light of the effects on the full-service agency; in light of the effects on your sales in terms of both cost and morale; and in light of greater fluctuations of revenues that are likely to result from the apparent uncertainty of your rate structure.
 
 
 53
 In a memorandum to top management of Time dated October 2, 1970, Auer recounted a talk with Bond in which he had explained why Time felt it must "accept business from a company direct on a net basis" and "totally rejected the concept that the agencies were working for us and media departments were doing our selling for us."[21] Bond "wanted to express his feelings that this could deteriorate into a very serious problem for him and other agencies." Auer said that Time would not make a public statement and hoped Y& R would not start a controversy in the trade press. Auer's memorandum also noted that Dan Seymour of JWT had called Andrew Heiskell of Time to ask if Time was going to announce that it would accept business on a direct basis; Heiskell denied any such intention. Despite the polite tone a reasonable juror could find that two of the country's largest agencies had joined in an effort to put pressure on Time to adhere to existing policies which had the effect of denying advertisers the right to deal directly with the media, pay their own costs, and receive an appropriate discount. Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959), suggests that this would be actionable not only against the maker of the threat but against a complying recipient.
 
 
 54
 In sum, a jury could have concluded from all that we have recited not to speak of the inferences it might have drawn from oral testimony by persons interviewed by Time or by officials of Time or the N.Y. Times[22] that the conscious parallelism of the dual rate system was not the result of hundreds of unanimous individual decisions but rather was an agreement including many publishers who believed the system made it unduly expensive to advertise and who went along with it, insofar as they did, only because of sloth or fear of reprisal. We do not say, of course, that a jury would have so found only that it might rationally have done so.
 
 IV.
 
 55
 What has been established up to this point is that a jury could have found there was a contract or conspiracy in restraint of trade by some agencies and some members of the media with respect to pricing policies in the period 1968-1972.[23] Appellees say this still leaves Ambook a long way from home.
 
 
 56
 The keystone of appellees' argument here is that Ambook did not deal with the 4A's or with any of the agency defendants but solely with Schiff-Brown. As indicated above, Schiff-Brown's relation to the 4A's was tangential at most; it surely was not a policy forming member.[24] Schiff testified unequivocally that agreement or no agreement he would not have serviced the Ambook account for less than 15% Of the card rates. Any injury to Ambook's property and business must therefore come not from the dealings it had with Schiff-Brown but from the fact that except for the alleged illegal agreements, it would have been able to deal directly with Time, the N.Y. Times and other media, and have achieved substantial savings if given the same discount as the agencies or even a lesser discount if this would produce a smaller cost to the advertiser than the present system.
 
 
 57
 Appellees mount several lines of defense. They say in the first place that Ambook never sought recognition for a house agency that would have handled its advertising. For the N.Y. Times the answer is unavailing. A jury could have found that for the period up to February 18, 1970, such an offer would have been useless since until then the N.Y. Times would not recognize a house agency with less than three accounts. The standards laid down when that policy was abandoned were rather severe and there was no public announcement of the abandonment. The record does show that by April 9, 1973, the N.Y. Times recognized 35 house agencies but does not inform us how many such recognitions occurred during the period ended June 1, 1972.[25] Time stands better in one respect, worse in another. It stands better in that it never had any such explicit "three-account" policy for qualification as a house agency as did the N.Y. Times. The record shows that by February 8, 1973, it had recognized 19 house agencies.[26] It stands worse in that Ambook did make a request of Time for recognition as a house agency. This did not occur until March 1972, by which date Time may well have had ample reasons for refusing to accept Ambook's advertising at all. However, Time's stated reason for declining Ambook's request was:
 
 
 58
 Direct advertisers cannot qualify for agency discount but must pay the card rates.
 
 
 59
 The media defendants contend also that Ambook was in no position to deliver advertising in a form that would enable it to realize economies if given the agency discount. They stress peculiar difficulties allegedly associated with advertising which seeks a response, often accompanied by money, as in the case of a book club, and claim that even many established agencies are unequipped or unwilling to undertake such work. Against this Mr. Lyman averred that, but for the 15% Requirement, Ambook "would have been able to hire more employees and more highly qualified employees if advertising services were performed within the company", or that he might also have hired an advertising consultant for a year. The Time report shows that many companies, although presumably larger than Ambook, are currently using a combination of in-house talent, outside agencies deemed particularly suitable for special promotions, and space buying services, as a substitute for the full-service agency. Indeed several such companies figure on the "house agency" lists of Time and the N.Y. Times to which we have referred above. So far as we can see, the district judge made no determination that Lyman's assertions were so outlandish as to be unworthy of belief by a jury, and, whatever our personal views may be as to Ambook's ability to handle its advertising functions for less than the 15% Commission, we perceive no fair basis for doing so.
 
 
 60
 It therefore appears to us to have been error to grant summary judgment in favor of Time and the N.Y. Times with respect to Ambook's claims against them for alleged losses in being forced to deal with them through an agent on the 15% Commission basis.
 
 
 61
 A separate question is whether it was nevertheless proper to enter summary judgment in favor of the 4A's and the three remaining agency defendants, see note 2 Supra, for damages allegedly suffered by Ambook in its dealing with Time and the N.Y. Times. Appellees argue that since Ambook did not deal with the 4A's or any of the agency defendants it cannot recover from them even if they were parties to an illegal conspiracy. Relying on Judge Adams' characteristically able opinion for a divided panel in Mid-West Paper Products Company v. Continental Group, Inc., 596 F.2d 573 (3 Cir. 1979), appellees assert that Ambook has no standing to sue the agency defendants, since Schiff-Brown was not a member of the alleged conspiracy.
 
 
 62
 This case differs from Mid-West Paper in material respects. In that case plaintiff sought to recover damages for injuries sustained in dealing with nonconspiring manufacturers who were allegedly able to charge higher prices under the anticompetitive "umbrella" erected by defendant conspiring manufacturers. Recovery was sought from conspirators despite the lack of contact with any of them. Here Ambook has indisputably dealt with Time and the N.Y. Times. Plaintiff having dealt with these members of the alleged illegal conspiracy, all other members are jointly and severally liable for the damages Ambook sustained. See State of Washington v. American Pipe & Construction Co., 280 F.Supp. 802, 804-05 (W.D.Wash.1968); Wall Products Co. v. National Gypsum Co., 357 F.Supp. 832, 840 (N.D.Cal.1973); Tondas v. Amateur Hockey Ass'n, 438 F.Supp. 310, 315 (W.D.N.Y.1977). A jury could have found that, pursuant to the conspiracy, Time and the N.Y. Times denied Ambook the opportunity of placing ads directly with appropriate discounts. The Time report is evidence that the agencies rather than the media were the prime movers behind maintenance of this dual rate system. As Judge Weinfeld has said, "the law is clear that one who participates in and furthers wrongful conduct may also be held liable with the other alleged wrongdoer." Data Digests, Inc. v. Standard & Poor's Corp., 43 F.R.D. 386, 389 (S.D.N.Y.1967).[27]
 
 
 63
 On the other hand, we think summary judgment was properly granted in favor of all defendants in respect of Ambook's dealings with media not named as defendants. Ambook conceded that it never sought in-house agency treatment from them (as it did of Time), and there is no evidence of record that such an effort would have been futile. One can guess that Ambook would not have received a warm welcome, but speculation of this sort does not suffice, particularly in light of the judge's repeated directions that Ambook must adduce evidence on this subject.
 
 
 64
 We regret having been obliged to pass on issues of possibly great consequence to the advertising industry in an action by a single advertiser, now out of business, and which comes before us on appeal from the grant of summary judgment to the defendants. However, it was the defendants (including the industry's trade association) who chose to pursue this procedural course, they have been ably represented by experienced counsel, and we cannot refuse to decide issues properly tendered to us.
 
 
 65
 The order denying class action status is affirmed. The grant of summary judgment is affirmed with respect to the Robinson-Patman Act claims, and with respect to any damages arising from Ambook's dealings with unnamed members of the media, but is reversed with respect to the other damage claim.[28] The cause is remanded for further proceedings consistent with this opinion. No costs.
 
 MOORE, Circuit Judge (dissenting):
 
 66
 I dissent.
 
 
 67
 In my opinion, this case presents the rather extraordinary situation of the majority resuscitating an alleged antitrust suit, brought by a plaintiff which concededly has "been out of business since mid-1972 and was in the process of liquidation".[1] The trial judge having given the plaintiff every opportunity by depositions, discovery and affidavits to produce such proof as it might have had to support a claim, came to the conclusion that "(t)here is no evidence sufficient to permit a finding that any of the agency defendants (Young & Rubicam, BBDO, and J. Walter Thompson) was a party to a combination or conspiracy injuring the business or property of Ambook during the period 1968-72". 464 F.Supp. at 1145. The same finding was made with respect to The New York Times and Time. Based on the trial court's finding that "(T)here is no evidence that the 4A's did anything during the damage period, or for many years prior to the damage period, to promote or maintain any phase of the alleged conspiracy. . . ." 464 F.Supp. at 1136, it granted summary judgment for the defendants.
 
 
 68
 Since I believe that cases should be decided upon the facts presented to the trial court, I take issue with the decision of the majority which by its own declarations has, in my opinion, created hypothetical and speculative situations and then, based upon inferences from these hypotheses, prophesied a possible jury conclusion.
 
 
 69
 An illustration will suffice. "A jury could rationally conclude from the evidence here adduced that during the damage period substantially all advertising agencies and the publishing media pursued a plan whereby If a national advertiser approached a newspaper or magazine, he Would typically be told that If he were willing to deal through a recognized agency, the agent Would receive a 15% Deduction but that otherwise he would be charged the full card rate." (emphasis added). This despite the previous statement that "At least eight types of compensation between advertisers and agencies are now in effect, although the record does not show their relative frequency or much else about them." To me, although eight types of financial arrangements are conceded to exist (post-1956), the majority's assumption as to a jury's rational conclusion is pregnant with the belief that a contrary conclusion would be irrational. In contrast to the majority's assumptions, the trial court found not on the basis of assumptions but on the proof actually before it that:
 
 
 70
 "Neither the documents nor any other evidence proposed by Ambook suggest that, following the consent decrees of 1956, there was any step taken by the 4A's or anyone else to prevent advertising agencies from making whatever compensation arrangements they wished with their clients. The use of fees and cost-plus arrangements was growing, and there is no evidence that the 4A's or anyone else was engaging in any kind of conspiratorial activity to put a stop to the growth of these different compensation methods.
 
 
 71
 * * * There is no evidence that the 4A's did anything during the damage period, or for many years prior to the damage period, to promote or maintain any phase of the alleged conspiracy. This finding is crucial to the present case, since it means that the alleged promoter and leader of the conspiracy was not performing these functions during the period relevant to this lawsuit." 464 F.Supp. at 1136.
 
 
 72
 As to burden of proof, the burden was on the plaintiff to prove a conspiracy. There was no duty on the part of any defendant to justify its business policy or practices in choosing as a matter of business judgment to pay a 15% Commission instead of resorting to any of the other methods of compensation previously mentioned. Yet the majority, in effect, places the burden on the defendants of justifying their business decision by saying: "here the media offered no evidence to show what legitimate business advantage, save continuity and fear of reprisal, inhered in the dual rate system".
 
 
 73
 To its reliance upon "conscious parallelism" the majority adds its theory of coercion despite the fact that the trial judge found to the contrary.
 
 
 74
 The formation in 1970 of a committee to examine into the possible elimination of the agency commission instead of proving a conspiracy, in my opinion, proves the opposite. Using the majority's statement thereof: "A symposium in a media publication, attended by many elements of the trade, reported a host of different views about the 15% Commission". Clients of Time thought abolition right in concept; wrong until details of a new system were worked out. The reaction of the airlines and the automobile industry were mixed. Again, despite the fact that there was a wide divergence of views the antithesis of a conspiratorial agreement the majority not having attended the committee meetings nor having heard the discussions, chose to substitute their conclusion that a rational jury could have found that the committee acted "only because of sloth or fear of reprisal". After hearing Ambook and analyzing all the material Ambook was able to offer, the trial court found that: "The undisputed facts are that Time was making an independent re-examination of the 15% Commission"; that Time "consulted with representative advertising agencies with whom Time did business in normal course and advertisers who advertised in Time, to determine what their views would be on the possible discontinuance of the 15% Commission". 464 F.Supp. at 1144.
 
 
 75
 In the field of injury to property, a hypothetical and highly speculative situation is all that Ambook has presented. It says "Ambook would have been able to hire more employees and more highly qualified employees if advertising services were performed within the company" or that he might also have hired an advertising consultant for a year. Again, no proof, merely speculative hypotheses.
 
 
 76
 A brief word concerning the majority's apologia. Some explanation was, of course, necessary to explain why a court of appeals should "pass on issues of possible great consequence to the advertising industry, in an action by a single advertiser, now out of business . . . ."
 
 
 77
 Any "regret" at "having been obliged" to pass on the issues is mollified by an apparent desire to have the federal courts and/or a jury of laymen dictate to the advertising and media businesses how in the courts' or juries' opinion they should conduct their business operations, despite the previous decree.
 
 
 78
 In my opinion, summary judgment was the correct procedure for the defendants to follow. Rule 56(c) of the Federal Rules of Civil Procedure is applicable to antitrust cases. The facts material to a decision are undisputed and have been set forth at length by the trial court. On appeal they should be sustained unless clearly erroneous. Rule 52(a) F.R.Civ.P.
 
 
 79
 Recent cases have been informative as to the role of summary judgment in antitrust cases. In Lupia v. Stella D'Oro Biscuit Co., Inc., 586 F.2d 1163 (7th Cir. 1978) the motions for summary judgment were, as here, based on a substantial record assembled by discovery and affidavits, establishing beyond the mere allegations of the pleadings, what the plaintiff was and was not able to prove. Noting that "there is no requirement that judges exercise greater caution in granting summary judgment in these (antitrust) cases than in any other", the court affirmed the judgment in favor of the defendants with the following comment equally applicable here:
 
 
 80
 "Indeed, the very nature of antitrust litigation would encourage summary disposition of such cases when permissible. Not only do antitrust trials often encompass a great deal of expensive and time consuming discovery and trial work, but also, (without intending any slur on plaintiff here), the statutory private antitrust remedy of treble damages affords a special temptation for the institution of vexatious litigation, see Poller, supra, 368 U.S. at 474, 82 S.Ct. 486 (Harlan, J. dissenting). (Poller v. Columbia Broadcasting System, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1961).) The ultimate determination, after trial, that an antitrust claim is unfounded, may come too late to guard against the evils that occur along the way. Judge (now Chief Judge) Skelly Wright, in a libel case, Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966), noted that:
 
 
 81
 ' * * * Summary judgment serves important functions which would be left undone if courts too restrictively viewed their power. Chief among these are avoidance of long and expensive litigation productive of nothing, and curbing the danger that the threat of such litigation will be used to harass or to coerce a settlement. * * * (Id. 125 U.S.App.D.C. at 35, 365 F.2d at 968.)' "
 
 
 82
 Lupia v. Stella D'Oro Biscuit Co., Inc., 586 F.2d at 1167.
 
 
 83
 In First Nat. Bank v. Cities Service, 391 U.S. 253, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), the Supreme Court, mindful of the four cases cited by the majority here and upon which they and petitioners in Cities Service relied, affirmed in an antitrust case summary judgment in favor of the defendant.
 
 
 84
 The cardinal fallacy which I find permeates the opinion of the majority and leads to its conclusion is that it treats this case as if it were an appeal from the government's 1955 civil antitrust case which involved virtually the same issues as here presented. The 1956 consent decree dealt with the same problems now before us. The pre-1956 practices complained of were enjoined and the slate for all practical purposes was wiped clean.
 
 
 85
 The trial court found that "Ambook has specifically conceded that it has no evidence of conspiratorial activity by the 4A's during the period 1968-72, or at any time after 1960. There is no evidence that the 4A's did anything during the damage period, or for many years prior to the damage period, to promote or maintain any phase of the alleged conspiracy." 464 F.Supp. at 1136. It was incumbent upon Ambook to come forward with proof of post-1956 violations. Many witnesses were deposed; scores of exhibits were introduced. A full-scale trial could not have been more exhaustive.
 
 
 86
 Having given Ambook every opportunity to submit any proof it desired in aid of its claim, the trial court concluded: "There is no evidence sufficient to permit a finding that any of the agency defendants was a party to a combination or conspiracy injuring the business or property of Ambook during the period 1968-72." 464 F.Supp. at 1145. The same finding was made as to The New York Times and Time.
 
 
 87
 In this case I would subscribe to the words of the late Mr. Justice Harlan, joined by Mr. Justice Frankfurter, Mr. Justice Whittaker and Mr. Justice Stewart in his dissent in the five to four decision in Poller v. Columbia Broadcasting, 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962):
 
 
 88
 "As I see it, this is one of those cases, not unfamiliar in treble-damage litigation, where injury resulting from normal business hazards is sought to be made redressable by casting the affair in antitrust terms. I think that the antitrust laws do not fit this case, and that the courts below were quite correct in holding that the respondents were entitled to judgment as a matter of law." 368 U.S. at 474, 82 S.Ct. at 491.
 
 
 89
 As in this case, the trial court had before it affidavits and depositions. The trial court in Poller had granted summary judgment in an antitrust case in favor of the defendants. I would also adopt Mr. Justice Harlan's apologia when he said
 
 
 90
 "I have gone into this matter at some length because in my opinion the Court's encouragement of this sort of antitrust 'enforcement' does disservice to the healthy observance of these laws. I would affirm." 368 U.S. at 486, 82 S.Ct. at 498.
 
 
 91
 I would find it difficult, if not impossible, to formulate a charge to a jury which would not be based upon groundless speculation hence I would affirm.
 
 
 
 [1]
 Defendants have not claimed the action to be dismissible on this ground
 
 
 [2]
 Bates has settled with plaintiff and no longer has any interest in this action
 
 
 [3]
 In each instance Ambook dealt with Victor Schiff, who specialized in the direct response advertising in which Ambook was interested. Mr. Schiff was associated with Newmark, Posner & Mitchell, Inc., in an office and credit sharing arrangement, and Victor Schiff & Company had a similar arrangement with Kaplan. Newmark, Posner & Mitchell, Inc. and the Kaplan Agency were apparently members of the 4As; Schiff/Brown & Company was not
 
 
 [4]
 This figure is simply the arithmetical relationship of 15/85
 
 
 [5]
 As the trial judge correctly pointed out, 60 F.R.D. 481-82, the date January 1, 1968, must have been an inadvertent error for June 1, 1968, since damages prior to the latter date were barred by the four-year statute of limitations, 15 U.S.C. § 15b
 
 
 [6]
 Baum v. Investors Diversified Services, Inc., 409 F.2d 872 (7 Cir. 1969) (mutual fund shares); TV Signal Co. of Aberdeen v. American Telephone & Telegraph Co., 462 F.2d 1256, 1259 (8 Cir. 1972) (space on telephone pole used for CATV service cables); La Salle Street Press, Inc. v. McCormick & Henderson, Inc., 293 F.Supp. 1004, 1006 (N.D.Ill.1968) (patent license), modified on other grounds, 445 F.2d 84 (7 Cir. 1971); Kennedy Theater Ticket Service v. Ticketron, 342 F.Supp. 922 (E.D.Pa.1972) (theater tickets); Plum Tree, Inc. v. N. K. Winston Corp., 351 F.Supp. 80, 87 (S.D.N.Y.1972) (shopping center leasehold); American Telephone & Telegraph Co. v. Delta Communications Corp., 408 F.Supp. 1075, 1114 (S.D.Miss.1976), aff'd on district court opinion, 579 F.2d 972 (5 Cir. 1978) (television program and advertising package)
 
 
 [7]
 See generally 2 Areeda and Turner, Antitrust Law § 316 (1978)
 
 
 [8]
 See United States v. Diebold, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1972) (per curiam); 10 Wright and Miller, Federal Practice and Procedure § 2716, at 430-32
 
 
 [9]
 See 6 Moore, Federal Practice P 56.15(3), at 56-469-472; P 56.15(8), at 56-642; Adickes v. S. H. Kress & Co., 398 U.S. 144, 157-61, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970)
 
 
 [10]
 Compare Solomon v. Houston Corrugated Box Co., Inc., 526 F.2d 389, 393 (5 Cir. 1976); Beckers v. International Snowmobile Industry Ass'n, 581 F.2d 1308, 1311 (8 Cir. 1978), Cert. denied, 440 U.S. 986, 99 S.Ct. 1801, 60 L.Ed.2d 248 (1979); Merit Motors, Inc. v. Chrysler Corp., 417 F.Supp. 263, 266 (D.D.C.1976), Aff'd, 187 U.S.App.D.C. 11, 569 F.2d 666 (D.C.Cir. 1977)
 
 
 [11]
 The Time report, referred to below, indicates that the system may have gone back as far as 1864. Although it has become customary to speak of the 15% As a "commission", it is not such in the ordinary sense. The advertising agency is not the seller's agent but the buyer's. The system is thus better characterized as a dual price system the card rate for the direct advertiser and 15% Less when the advertising is done through an agency with the agency receiving the difference
 
 
 [12]
 For example, if an advertiser could perform the services rendered by the agency at 8% Of the card rate, his costs would be 7% Less if he could deal directly with the medium at the rate accorded the agency. One item of potential saving would be any excess of the agency's profit over what would be a fair return on whatever assets the advertiser devoted to providing the services; plaintiff adduced evidence that the return on investment for five publicly traded advertising agencies during the period 1968 through 1972 averaged over 19%
 
 
 [13]
 (A) A conspiracy among all the defendants whereby the media associations adopt substantially uniform standards for recognition of advertising agencies, only agencies meeting such standards may be extended credit and allowed agency commissions, agencies which rebate any part of their commissions to advertisers will be cut off; recognition will be denied to house agencies; and gross rates would be charged to direct advertisers. Also that members of the media associations adhere to their published rates, and that agency commissions be fixed and maintained at 15% Of the gross rate for advertising. (B) A conspiracy between the 4As and its members whereby members would retain all commissions and not rebate any part of them to advertisers; commissions would be retained at 15%; and that members refrain from competing with each other by submitting advertising copy etc. in solicitation of new business. (C), (D), (E), (F) and (G) Conspiracies between the media associations and their members to substantially the same effect as (A)
 
 
 [14]
 We are, of course, fully aware that under § 5(a) of the Clayton Act, 15 U.S.C. § 16(a), a plaintiff cannot make use of a consent decree against a defendant in an action where no testimony was taken, and also that private plaintiffs cannot enforce government consent decrees, see United States v. American Society of Composers, Authors and Publishers, 341 F.2d 1003, 1007-08 (2 Cir.), Cert. denied, 382 U.S. 877, 86 S.Ct. 160, 15 L.Ed.2d 119 (1965); Dahl, Inc. v. Roy Cooper Co., Inc., 448 F.2d 17, 20 (9 Cir. 1971); Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 750, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). However, we read the district court's opinion and appellees' argument as taking the consent decrees as a watershed, see 464 F.Supp. at 1137. Conceding, as seemingly they must, that certain of the pre-1956 practices violated § 1, appellees contend that all the evils existing then have since been cured. It is thus primarily the defendants who rely on the consent decree; we view it simply as a historical fact
 
 
 [15]
 These are:
 
 
 [1]
 Media commissions plus percentage of other charges and additional fees for certain specified services
 
 
 [2]
 Same as No. 1, without the additional fees for certain specified services
 
 
 [3]
 Media commissions only
 
 
 [4]
 One of Nos. 1, 2, or 3, plus an overall fee, sometimes called a retainer
 
 
 [5]
 One of Nos. 1, 2, or 3, but with the addition of a guaranteed minimum profit percentage and a controlled maximum profit percentage
 
 
 [6]
 Minimum fee or media commissions, whichever is larger
 
 
 [7]
 Overall fee on the entire account, with no other compensation, the fee to be agreed upon in advance and billed periodically
 
 
 [8]
 Cost plus an agreed overage
 The last two are wholly unrelated to the media 15% "commission".
 
 
 [16]
 The fact that apparently there was little direct advertising does not undermine the possibility of this inference. A jury could find that, without substantially unanimous action by the media to prevent it, a market for such advertising could be expected to develop, a market which those adhering to the dual rate system would lose to the renegades. Nor does the fact that the effect of unanimous action would be essentially to eliminate direct advertising as a mode of doing business (except for those advertisers able to create house agencies) invalidate the analysis: non-unanimous action would have the far more deleterious effect on those adhering to the system of channeling direct advertisers to non-adhering competitors
 
 
 [17]
 Professor Handler doubts whether a verdict for the plaintiff in Theatre Enterprises would have been upheld, 1 Twenty-Five Years of Antitrust 565-66, and so do we. Defendants had proffered such overwhelming evidence of the individual reasons for their parallel behavior as completely to overcome whatever inference would arise from that alone
 
 
 [18]
 See Turner, The Definition of Agreement Under the Sherman Act: Conscious Parallelism and Refusals to Deal, 75 Harv.L.Rev. 655, 665-73 (1962); cf. Posner, Antitrust Law 42-47 (1976)
 
 
 [19]
 "(Plaintiff) now argues that Cities' participation in the conspiracy was obtained by threats of retaliation from the other defendants. While conceivably petitioner could have argued at the trial level that under such cases as Klor's (Klor's, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741) . . . and Parke, Davis (United States v. Parke-Davis & Co., 362 U.S. 29, 80 S.Ct. 503, 4 L.Ed.2d 505) . . . acquiescence because of threats in an illegal scheme conceived and carried out by others for their own benefit makes the acquiescing party a member of an illegal combination, we decline to pass upon such a contention when presented for the first time in this Court." 391 U.S. at 280 n. 16, 88 S.Ct. at 1588
 
 
 [20]
 The precise instruction was:
 TIME wants to eliminate the agency commission. What are the alternatives to this method of compensation? How can these alternatives be implemented?
 This language suggests that at least when the inquiry began the publisher of Time considered the agency "commission" something against Time's interest, to which it was being held by others.
 
 
 [21]
 Auer was surely right about this. The agency is the advertiser's agent, not the media's. It would be wholly improper for the agency to include in its charges to a client services as sales agent for the medium. Yet Bond could be taken as having more than implied that the agencies were doing exactly this
 
 
 [22]
 We do not read the record as waiving any right of Ambook to call such persons. The limitation referred to above (p. 609) was on the specific issue of Ambook's relations with Schiff-Brown
 
 
 [23]
 Appellant seemingly assumes that if an agreement for a dual pricing system existed, this would be a Per se violation of § 1. Appellees, concentrating on the alleged absence of sufficient evidence of an agreement and the other points discussed in this section, did not argue whether such an agreement would constitute a Per se violation or would be subject to the rule of reason. Plaintiff made no claim that members of the media agreed among themselves to fix their card rates. The case seems more analogous to concerted refusal to deal. We note that recently there has been considerable questioning of the applicability of Per se rules to certain types of such refusals. The thrust of the Supreme Court decision in Continental T.V., Inc. v. GTE Sylvania, Inc., 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), has not gone unnoticed. See Oreck Corp. v. Whirlpool Corp., 579 F.2d 126 (2 Cir.) (en banc), Cert. denied, 439 U.S. 946, 99 S.Ct. 340, 58 L.Ed.2d 338 (1978); Gough v. Rossmoor Corp., 585 F.2d 381, 387 (9 Cir. 1978), Cert. denied, 440 U.S. 936, 99 S.Ct. 1280, 59 L.Ed.2d 494 (1979); Sullivan, Antitrust § 90 (1977). Compare Webb v. Utah Tour Brokers Ass'n, 568 F.2d 670, 675-76 (10 Cir. 1977); Coughlin v. Capitol Cement Co., 571 F.2d 290, 300 (5 Cir. 1978). Much seems to turn on characterization of the alleged agreement as vertical or horizontal, no easy task in the present case, and one which we decline to undertake without the benefit of argument and prior decision below. A further turning away from Per se rules was recently evinced in Broadcast Music, Inc. v. Columbia Broadcasting System, Inc., 440 U.S. 1, 99 S.Ct. 1551, 60 L.Ed.2d 1 (1979). We think the district judge would be well advised to take evidence on the subject of reasonableness if the defendants choose to offer it and to make appropriate findings
 
 
 [24]
 See note 3 Supra
 
 
 [25]
 The list does not describe the companies. While we can take notice that most of these are of a size dwarfing Ambook, e. g. Burlington Industries, Santa Fe Railway and Monsanto, it may or may not contain others where no such gross disparity existed
 
 
 [26]
 These are even more predominantly large companies including the three mentioned in note 25 Supra than the N.Y. Times list
 
 
 [27]
 We note the pendency in Congress of legislation that would allow contribution among defendants in civil price-fixing cases, see 48 L.W. 2045 (July 17, 1979), thereby repealing Pro tanto the common law rule of no contribution among intentional joint tortfeasors, Restatement of Torts 2d § 886A(3) (1979)
 
 
 [28]
 If Ambook should be awarded damages, consideration would have to be given to the effect of its receipt from Bates, see note 2 Supra
 
 
 [1]
 The period of alleged damages was 1968-1972. The Delaware statute provides for a continuance with respect to unfinished litigation